CAROL W. HILTON, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2088–74, 5117–75, 5172–75, 5571–75, 5622–75, 5641–75, 5654–75, 5655–75, 6851–75, 7210–75, 8097–75, 8052–76, 8055–76, 8056–76, 8060–76.

Filed May 19, 1980.

---

[1]Cases of the following petitioners are consolidated herewith: Edward R. Bloomquist and Lila M. Bloomquist, docket No. 5117–75; DeSales G. DuVigneaud and Lola F. DuVigneaud, docket No. 5172–75; Raymon E. Lawton and Rosellen M. Lawton, docket No. 5571–75; Matthew C. Gleason and Janice M. Gleason, docket No. 5622–75; Theodore E. Marvis and Phyllis H. Marvis, docket No. 5641–75; DeVere W. McGuffin and Anetta T. McGuffin, docket No. 5654–75; Philip E. Hilton and Barbara J. Hilton, docket No. 5655–75; Louis L. Smith and Marguerite M. Smith, docket No. 6851–75; Chester D. Wahlen and Eleanor J. Wahlen, docket No. 7210–75; Joseph C. Hayward and Marjorie S. Hayward, docket No. 8097–75; Norman S. Wong and Lana Wong, docket No. 8052–76; Theodore S. Wong and Jean G. Wong, docket No. 8055–76; Daniel M. Martin and Ann Y. Martin, docket No. 8056–76; and Henry S. Wong and Katie K. Wong, docket No. 8060–76.

*Robert P. Simpson, William M. Schindler,* and *Walter J. Cummings III,* for the petitioners.[2]

*Louis A. Boxleitner* and *Marion K. Mortenson,* for the respondent.

NIMS, *Judge:* These consolidated cases were assigned to be heard by Special Trial Judge Charles R. Johnston pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed on November 7, 1978, and, subsequently, the parties filed exceptions to his report. Such exceptions have been duly considered by the Court. Due regard has also been given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses. See Rule 182(c) and (d), Tax Court Rules of Practice and Procedure, and the Note thereto, 60 T.C. 1057, 1149–1150 (1973).

Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket Nos. | Petitioners | Taxable years | Deficiencies |
|---|---|---|---|
| 2088–74 | Carol W. Hilton................ | 1969 | $12,854.10 |

---

[2]Brief amicus curiae was filed by Alan J. B. Arohsohn as attorney for the National Realty Committee, Inc.

| | | | |
|---|---|---|---|
| 5117–75 | Edward R. Bloomquist and Lila M. Bloomquist ......... | 1969 | $4,704.00 |
| | | 1970 | 1,938.28 |
| 5172–75 | DeSales G. DuVigneaud and Lola F. DuVigneaud ........ | 1967 | 25,141.47 |
| | | 1968 | 7,150.83 |
| | | 1969 | 7,325.02 |
| | | 1970 | 6,854.97 |
| 5571–75 | Raymon E. Lawton and Rosellen M. Lawton ......... | 1967 | 23,756.73 |
| | | 1968 | 7,352.25 |
| | Raymon E. Lawton ........... | 1969 | 3,786.92 |
| | | 1970 | 3,531.36 |
| | Rosellen M. Lawton........... | 1969 | 3,802.31 |
| | | 1970 | 3,543.14 |
| 5622–75 | Matthew C. Gleason and Janice M. Gleason............ | 1965 | 2,170.24 |
| | | 1966 | 6,407.60 |
| | | 1967 | 22,999.23 |
| | | 1968 | 12,090.06 |
| | | 1969 | 14,660.27 |
| | | 1970 | 11,448.35 |
| 5641–75 | Theodore E. Marvis and Phyllis H. Marvis ............ | 1967 | 20,621.00 |
| | Theodore E. Marvis .......... | 1968 | 3,449.18 |
| | | 1969 | 3,742.77 |
| | Phyllis H. Marvis.............. | 1968 | 3,486.80 |
| | | 1969 | 3,758.17 |
| | Theodore E. Marvis and Phyllis H. Marvis ............ | 1970 | 7,203.17 |
| 5654–75 | DeVere W. McGuffin and Anetta T. McGuffin......... | 1969 | 13,508.41 |
| | | 1970 | 3,641.00 |
| 5655–75 | Philip E. Hilton................ | 1969 | 12,854.10 |
| | Philip E. Hilton and Barbara J. Hilton............ | 1970 | 3,100.03 |
| 6851–75 | Louis L. Smith and Marguerite M. Smith ....... | 1969 | 6,648.00 |
| | | 1970 | 1,579.14 |
| 7210–75 | Chester D. Wahlen and Eleanor J. Wahlen........... | 1969 | 7,127.84 |
| | | 1970 | 2,587.00 |
| 8097–75 | Joseph C. Hayward and Marjorie S. Hayward ....... | 1967 | 28,477.90 |

| | | 1968 | $22,724.15 |
| | | 1969 | 15,233.97 |
| | | 1970 | 8,522.00 |
| 8052–76 | Norman S. Wong and Lana Wong | 1969 | 31,301.00 |
| | | 1970 | 7,530.00 |
| 8055–76 | Theodore S. Wong and Jean G. Wong | 1969 | 31,526.00 |
| | | 1970 | 7,927.00 |
| 8056–76 | Daniel M. Martin and Ann Y. Martin | 1970 | 3,224.00 |
| 8060–76 | Henry S. Wong | 1969 | 15,407.00 |
| | Katie K. Wong | 1969 | 15,506.00 |
| | Henry S. Wong and Katie K. Wong | 1970 | 7,177.00 |

This case involves (1) a sale-leaseback transaction between Broadway-Hale Stores, Inc. (Broadway), as seller-lessee, and Fourth Cavendish Properties, Inc. (Fourth Cavendish), as buyer-lessor; (2) the transfer by Fourth Cavendish of its interest, if any, in the property, located in Bakersfield, Calif., which is the subject of the sale-leaseback transaction (the property) to Medway Associates, a New York general partnership (Medway); (3) the acquisition of various interests in Medway by a series of "tier" partnerships: Grenada Associates (Grenada), Fourteenth Property Associates (14th P.A.), and Thirty-Seventh Property Associates (37th P.A.); and (4) the investment by petitioners as limited partners in two of the tier partnerships: 14th P.A. and 37th P.A.[3]

The principal issue presented for our consideration is whether petitioners are entitled to deduct their distributive shares of partnership losses. The issue arises in the context of the above-mentioned sale and leaseback transaction, and the claimed losses were attributable to the excess of interest expense and depreciation over rental income from the property and to compensation to partners.

Petitioners take the position that as members of one or the other of two partnerships, 14th P.A. or 37th P.A., they were entitled to deduct their distributive share of the alleged

[3] Some of the petitioners invested in 14th P.A., while others invested in 37th P.A., but the legal issues herein are identical as to the investments in both partnerships.

partnership losses. In support of their position, petitioners contend that the sale and leaseback was a bona fide transaction, that the substance of the sale and leaseback comported with its form, that petitioners entered the transaction for reasons of economic substance apart from tax considerations, that indirectly through the various partnership tiers they acquired a depreciable interest in the property and sufficient obligations vis-a-vis the debt to entitle them to depreciation and interest deductions, and that the partners' compensation at issue was payment for future services.

Respondent makes three alternative arguments:

1. The transactions were contrived and "sham" transactions entered into by petitioners for the purpose of creating and obtaining deductions for artificial tax losses and nondeductible payments.

2. The sale and leaseback was a mere financing transaction and petitioners through their partnership interests did not acquire sufficient risks, benefits and burdens of ownership to constitute them as the owners of the Property for tax purposes.

3. The transactions involving petitioners were not transactions entered into for profit but were without any legal, economic or business purpose other than tax avoidance.

Consequently, respondent's view is that petitioners are not entitled to any partnership loss deductions during the years at issue.

Respondent has also raised various alternative issues in the event we uphold the validity of the sale-leaseback and find that Fourth Cavendish acquired an interest in the Bakersfield property which passed through to petitioners. These issues are as follows:

(1) Whether the alleged salary payments by the partnerships to their general partners were nondeductible capital expenditures rather than ordinary and necessary business expenses.

(2) Whether the losses incurred for an entire year may be retroactively allocated to a limited partnership which did not acquire its indirect interest in the property until near the end of that year.

(3) Whether the property was acquired as new property eligible for 200-percent declining balance depreciation.

(4) Whether the partnership which held legal title to the

property effectively elected the optional adjustment to basis of partnership property provided by section 743[4] of the Code.

(5) Whether a partnership properly reflects income by employing a mixed cash-accrual method of accounting in which everything is on a cash basis except interest payments where the purpose of accruing interest payments is to offset rental payments paid in advance for the November 1 to January 31 quarter with interest payments paid in arrears for the same quarter.

The principal issue and the above alternative issues were severed for trial in this proceeding.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and the attached exhibits are incorporated herein by reference.

Except as noted hereinafter, all of the Federal income tax returns, joint or individual, filed by the petitioners herein were filed with the Internal Revenue Service Center, Ogden, Utah. Those returns not filed with the Ogden Service Center were filed with the District Director, Los Angeles, Calif., by the petitioners and for the years as follows:

| Petitioners | Years |
| --- | --- |
| DeSales G. DuVigneaud and Lola F. DuVigneaud | 1967 |
| Raymon E. Lawton and Rosellen M. Lawton | 1967 |
| Theodore E. Marvis and Phyllis H. Marvis | 1967 |
| Joseph C. Hayward and Marjorie S. Hayward | 1967 |
| Matthew C. Gleason and Janice M. Gleason | 1965 |
| | 1966 |
| | 1967 |

Petitioner Carol W. Hilton was a resident of West Lake, Ohio, at the time of filing the petition herein. Petitioners Theodore E. Marvis and Phyllis H. Marvis were residents of New York (APO) at the time of filing their petition herein. All the remaining individual petitioners herein were residents of California at the times their petitions were filed.

---

[4] All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

## A. *Background*

Broadway has used sale and leaseback transactions rather than conventional mortgage financing as a method of financing since 1947. This technique has enabled Broadway to carry an obligation on its books as rent rather than debt service, thus enabling Broadway to sidestep contractual limits on the amount of debt it could incur.

As sale and leaseback transactions were originally conceived in 1947, Broadway would simultaneously sell property directly to an insurance company and lease it back. Around 1964, the form of the transaction changed, and Broadway began to sell the property to a single-purpose financing corporation, which corporation (rather than an insurance company) would lease the property back to Broadway. The single-purpose financing corporation, which is established in each instance exclusively to effect a particular sale and leaseback transaction, would raise money to satisfy the purchase price by selling its newly issued bonds to insurance companies. The terms and conditions of and interest rates set by the insurance companies for the bonds would be governed by the going cost of money and the credit rating of Broadway.

Sale and leasebacks effected through single-purpose financing corporations were more advantageous to Broadway than a straight sale and leaseback with an insurance company because the insurance companies treated the bond purchase in the same manner as they treated the purchase of any other security, even to the point that the insurance company's bond department, rather than its real estate department, conducted the transaction. The bond department generally charges a lower interest rate, provides 100-percent financing (as opposed to the 66⅔- to 75-percent limit for mortgage financing), and repayment terms such that less than the face amount of the financing has to be amortized over the term of the note. It also usually allows more self-insurance on the part of the seller-lessee.

Wood, Struthers & Winthrop (Wood, Struthers), a Wall Street brokerage firm which has dealt in the sale of securities on the various exchanges, was involved with Broadway in the modified form of sale and leasebacks from the inception. Robert Winthrop, a "name" partner at Wood, Struthers, made the firm's connection with Broadway through two of Broadway's top executives. Subsequently, Roderick Cushman (Cushman), the

head of the Wood, Struthers real estate department, was the Wood, Struthers individual primarily concerned with negotiating various terms of the individual transactions. The Wood, Struthers real estate department would handle a transaction from beginning to end; it would negotiate the sale and leaseback with the lessee principals, establish the limited-purpose financing corporation, obtain permanent financing, and, ultimately, find investors.

On the Broadway transactions, Cushman dealt mainly with E. W. Ballard (Ballard), who at the times here relevant was financial vice president and treasurer of Broadway, and with John Caldecott (Caldecott), who was outside counsel for, and later an officer of, Broadway. Once Broadway had accepted a Wood, Struthers proposal, it was Cushman's duty to contact appropriate financial institutions to arrange financing for the property. He also arranged to obtain individual investors.

The course of events culminating in a sale and leaseback transaction was essentially the same for all the transactions. Typically, Ballard would inform Wood, Struthers or Cushman that Broadway planned to build a store. Wood, Struthers would line up insurance company lenders and then send a commitment letter to Broadway reflecting the terms of the transaction as required by Broadway and the insurance companies. Caldecott would review the letter on behalf of Broadway and suggest modifications, if necessary. Ballard would then sign the letter and send it back to Wood, Struthers. After the letter was returned, no further discussions or negotiations transpired regarding the sale except that on occasion Wood, Struthers would call to verify progress and costs because costs were only estimated in the commitment letter. At some point, as construction progressed, the parties would arrange for a closing date. From that point on, documentation would be arranged by outside law firms. Caldecott received drafts of the documents on behalf of Broadway. He focused on the indenture or deed of trust (the name of the document varied depending on the State) which constituted a lien against the property, since his primary concern was that Broadway's lease would still be valid if there was a default on the mortgage. Caldecott also reviewed the lease, and although he looked at the terms of the purchase, Broadway was only marginally interested in its terms.

Essentially, the only terms that varied from lease to lease

were the rent and the renewal terms. Rent over the interest term was usually calculated as a fixed percentage sufficient in amount to cover a substantial part or all of the mortgage amortization and the interest on the unpaid principal. Broadway negotiated the renewal terms to get as long a period of occupancy as possible. Originally, Broadway usually sought three successive renewal terms in the 20-plus year category. Subsequently, Broadway decided it preferred four 15-year renewal terms, although some leases contained 5- and 10-year renewal terms.

In some circumstances, there was an interim transfer which occurred before the construction was completed. This could occur in several different ways. Sometimes, a portion of the purchase price was paid, and a short-term lease was effected which incorporated the terms of the long-term lease by reference. On some occasions, Broadway would take back a trust deed and note for the balance due. In yet other instances, there was no trust deed and note: there was simply an agreement within the interim lease which required the lessor to pay the purchase price to Broadway on or before January 31 following the year in which the store was scheduled to open. Broadway had the same obligations under the interim lease that it had under the final lease, except that Broadway did not begin paying rent until it received the loan proceeds. Broadway did not retain documents relating to the interim leases. As part of its document retention program, it does not keep expired leases.

The transactions were structured with the intent that the single-purpose financing corporation serve as a conduit to pass title to the subject property through to investors.

Jack R. Young (Young) promoted many Wood, Struthers transactions and he and his corporation, Jack R. Young & Associates, Inc. (JRYA), participated in the syndication of 50 to 60 limited partnerships during the years 1967 to 1970. JRYA was a California corporation incorporated on May 11, 1966. Young owned approximately 75 percent of the stock and served as its president through 1967. Prior to embarking on a real estate career, Young was a life insurance salesman and a major portion of his clients were medical doctors, described by him as "relatively unsophisticated * * * investors * * * with [a] very limited knowledge in economics and finance," who looked to Young for advice concerning various investments which they were considering. Young found himself acting as a financial

adviser, searching for good investments for his clients and for cures for financial woes brought on by the poor advice of others. Young considered himself a better financial adviser than many of those whom his clients were using, which point of view led him into the business of finding real estate investments for his clients.

## B. *The Transactions*

In December 1964, Broadway was planning the construction of department store facilities at three California locations: Bakersfield, San Bernardino, and Sacramento. Broadway had acquired the Bakersfield land, which consisted of 12 acres of unimproved land, at a cost of $198,135.66. The Bakersfield land and building, i.e., the property, were the subject of the sale and leaseback in this case.

In December 1964, Broadway and Wood, Struthers entered into negotiations for the sale and leaseback of the three above-mentioned properties. Their preliminary agreement was memorialized in the form of a commitment letter dated March 11, 1965, from Wood, Struthers to Broadway. The commitment letter was reviewed for Broadway by Caldecott and accepted on behalf of Broadway by Ballard. The acceptance was not dated.

The commitment letter provided that Wood, Struthers would establish Fourth Cavendish as a single-purpose financing corporation. Fourth Cavendish was to purchase the property as well as the San Bernardino and Sacramento properties after the department store being constructed on each site was completed. Fourth Cavendish was then to lease the properties back to Broadway on a net lease basis. The total purchase price for the three properties was to be $9,600,000. Broadway agreed to lease each property from Fourth Cavendish at an annual rental of 6.33 percent of the purchase price to be paid by Fourth Cavendish for such property for an initial term of 30 years, with Broadway to have options to renew the leases for additional terms of 23 years, 23 years, and 22 years at annual rentals of 1½, 1, and 1 percent, respectively, of such purchase price.

Since Wood, Struthers had already arranged for five insurance companies to provide funding for the purchase, the commitment letter indicated that Fourth Cavendish intended to finance the full amount of the purchase by selling its corporate notes to such five companies. The terms of this financing were

subject to the approval of Broadway's management and board of directors. Repayment of the notes was to be secured by an indenture of mortgage and deed of trust on the properties in favor of trustees for the insurance companies and by an assignment of the leases and rentals to such trustees. The agreement also provided:

It is our understanding that the closings may take place after Broadway-Hale occupies the properties and therefore mutually satisfactory arrangements will be made to transfer title to each property to the ultimate owner prior to the time of occupancy.

Under the terms of Cushman's agreement with Wood, Struthers, he was entitled to retain any one or more properties for his own personal account in any one year. The group of properties under the Fourth Cavendish financing umbrella was selected by Cushman for his personal account.

In April 1965, an agreement was entered into among (i) Broadway, (ii) a development corporation, and (iii) Sears, Roebuck & Co. (Sears) for the development of a proposed shopping center in Bakersfield to be known as Valley Plaza Shopping Center (the shopping center). At that time, Sears owned a parcel of land lying to the west of Broadway's 12 acres at the site of the proposed shopping center. The agreement provided that Sears would construct a retail store facility on the parcel owned by it, and that Broadway would construct a retail store facility on its 12-acre parcel, the latter to be completed and ready for business not later than September 1, 1967. The two stores to be constructed by Sears and Broadway were to be connected by an enclosed, air-conditioned mall in which there would be other retail stores. The shopping center was in fact built in this manner.

The above agreement also imposed use restrictions on Broadway's parcel which bound Broadway and its successors in interest until at least the year 2000 and thereafter as long as 50 percent of the commercial (noncommon) areas of Broadway's parcel, Sear's parcel, or the mall between Broadway's parcel and Sear's parcel were used for the uses permitted therein. The following uses where prohibited by the agreement unless specifically permitted by the unanimous written agreement of the parties: general offices, automotive sales display, motor vehicle service garage, bowling alley, skating rink, motion picture theater, carwashing establishment, veterinary hospital,

mortuary, commercial laundry plant, and similar service establishments. The agreement also provided that no major retail foodstore or supermarket could be located on the Broadway parcel.

Broadway arranged and paid for the construction of the three-story, 155,000-square-foot department store building on its 12-acre parcel in Bakersfield. Construction began sometime after September 1965 and was completed in early January 1967. The store was occupied and opened for business by Broadway in February 1967. Using its own funds, Broadway incurred direct and indirect costs in the acquisition of the land and the construction of the store totaling $3,332,833.57.

In December 1967, the parties took steps to effectuate the sale and leaseback of the Bakersfield store. By this time, construction of the San Bernardino property had already been completed. The sale-leaseback of the San Bernardino property, using money obtained from the insurance companies as a part of the 9,600,000 loan package, was closed in early 1967. This was the so-called "first closing." Of the $9,600,000 loan package, $3,325,000 was used in the San Bernardino transaction, leaving a balance of $6,275,000 to be used in the Bakersfield and Sacramento transactions.

Fourth Cavendish had been incorporated under the laws of the State of Delaware on January 17, 1967. All of the issued and outstanding shares of stock of Fourth Cavendish were owned by Wood, Struthers or Cushman during the years before the Court.[5] The initial capitalization of Fourth Cavendish was $1,000, and no additional funds were transferred to the corporation.

At a special meeting held on December 14, 1967, the board of directors of Fourth Cavendish acted on a proposal that Fourth Cavendish acquire the Sacramento and Bakersfield properties from Broadway and enter into leases, with respect to said properties, with Broadway. Resolutions to the following effect were adopted:

(a) That Fourth Cavendish purchase the properties from Broadway at a price to be determined, but not in excess of $3,137,500 for each property.

(b) That Fourth Cavendish borrow from certain named insurance companies

---

[5]The record contains some internal inconsistencies regarding the ownership of Fourth Cavendish. However, for present purposes, we will accept as correct petitioners' contention that Cushman was the actual owner of Fourth Cavendish.

an amount not in excess of $6,275,000 to finance the cost of acquiring these properties.

(c) That Fourth Cavendish lease the Sacramento and Bakersfield properties, respectively, to Broadway for an original term commencing December 20, 1967, and ending on January 31, 1998, with options to extend each lease for three additional terms of 23 years, 23 years and 22 years, respectively.

(d) That Fourth Cavendish execute an indenture of mortgage and deed of trust conveying Fourth Cavendish's interest in the Sacramento and Bakersfield properties to trustees for the insurance compaines to secure the payment of the principal, interest and premium, if any, due on Fourth Cavendish's mortgage notes.

(e) As further security for the payment of the mortgage notes, that Fourth Cavendish assign its leases on the Bakersfield and Sacramento properties to the aforesaid trustees.

(f) That Fourth Cavendish, for such considerations as its officers deem adequate, convey the Sacramento property to Cushman and the Bakersfield property to Medway.

The so-called second closing, the phase of the financing and the sale-leaseback transactions involving the Bakerfield and Sacramento properties, took place on December 20, 1967. It involved a contemporaneous exchange of notes and documents, most of which had been executed previously, summarized here for convenience as a sequence of events occurring in their logical order:

*First.*—Fourth Cavendish borrowed $6,275,000 from the five insurance companies. This borrowing took the form of a sale by Fourth Cavendish of its 5⅛-percent mortgage notes (the mortgage notes or notes) in the aggregate amount of $6,275,000 dated December 20, 1967, and due January 31, 1998.

*Second.*—Of the $6,275,000 in proceeds obtained by Fourth Cavendish from the insurance companies, $3,137,500 was turned over to Broadway for the purchase of the property. Broadway, in turn, issued a corporation grant deed transferring title to the property to Fourth Cavendish. That deed is dated December 15, 1967, and was recorded with the Recorder of Kern County, Calif., on December 20, 1967.

*Third.*—Fourth Cavendish leased the property back to Broadway under an instrument entitled "Lease," dated "as of December 1, 1967." Broadway and Fourth Cavendish also executed a memorandum of lease dated "as of December 1, 1967" for purposes of recording and giving notice of the lease to third parties.

*Fourth.*—Fourth Cavendish transferred all of its interest in

the property to the trustees for the insurance companies (the trustee) under an instrument entitled "Indenture of Mortgage and Deed of Trust" (the mortgage indenture). This transfer was made to partially secure the payment of mortgage notes, including the mortgage notes referred to in *First* above, in the principal amount of $9,600,000. The mortgage indenture was executed on December 15, 1967, even though it is dated "as of December 1, 1967."

*Fifth.*—By an instrument entitled "Assignment of Lease and Agreement" made "as of December 1, 1967," and executed on December 15, 1967, Fourth Cavendish assigned all of its interest in the lease to the trustee. This assignment was made as additional security for the payment of the mortgage notes. By this instrument, Fourth Cavendish assigned all rents and other income to be received under the lease until such time as the principal amount of the indebtedness of Fourth Cavendish to the insurance companies was fully paid. Broadway was a party to this assignment and agreed to pay and deliver to the trustee all of the rents and other moneys payable by Broadway under the lease. Broadway also agreed, in this assignment, that it would deliver quarterly and annual financial reports of Broadway to the trustee and to the insurance companies.

*Sixth.*—Fourth Cavendish executed a corporation grant deed dated December 20, 1967, which provided that Fourth Cavendish "hereby grants to Medway Associates" (a newly formed partnership, hereinafter Medway, which is discussed below) the property subject to:

(a) The lease;
(b) The mortgage indenture;
(c) The assignment of the lease; and
(d) Encumbrances of record.

The deed was recorded with the Recorder of Kern County, Calif., on May 14, 1968. It bears the marginal notation that the transfer was for a "consideration less than $100.00." No documentary stamps of the kind called for by section 4361 of the Internal Revenue Code of 1954 are affixed to this deed. There was no consideration paid by Medway to Fourth Cavendish for the transfer of the property. The mortgage notes are solely corporate obligations of Fourth Cavendish. There is no recourse for the payment of the principal, interest, or premium on the notes

against any shareholder, officer, or director of Fourth Cavendish.

Meanwhile, individuals had been obtained to invest in the property. Originally, Cushman intended to syndicate the property himself, but Young convinced Cushman in late 1966 to let Young syndicate the property for him. Young and employees of his corporation, JRYA, attracted investors into this transaction. Five investors were originally obtained.

When Cushman decided to bring Young into the transaction, Cushman was going to make Young a general partner in the partnership to which Fourth Cavendish assigned the property, and Young's investors were to be limited partners in the same entity. By letter addressed to Young and dated November 20, 1967, Wood, Struthers set forth the terms as originally contemplated. The letter outlined broadly the terms of the sale and leaseback and indicated that the partnership, Medway, then owned the land and improvements, and that Broadway was occupying the premises on a rent-free basis until permanent financing was obtained and net costs were paid. The letter also indicated that (1) Medway was a limited partnership, (2) Young was to sell a 49-percent interest to such extent as he might direct, and (3) the Young group would pay $110,000 for this interest, $8,000 of which would be allocated as the purchase price for the 49-percent partnership interest and $102,000 of which would be allocated as a payment for services. Young relayed this information to his five investors, who each executed a 2-page commitment letter which broadly outlined the terms of the sale and leaseback, and who each agreed to and did contribute $36,000 for the purchase of a 9.8-percent interest in Medway. The letter indicated that the investors' role in the transaction was "subject to final approval by all parties of the partnership agreement, and subject to approval by Broadway-Hale of the individual partners entering into the limited partnership."

Young and Cushman subsequently decided to restructure the transaction so that two partnerships would be involved. Medway was to be a general partnership to which the property would be transferred, and the other partnership was to be a limited partnership, formed by Young with JRYA as the general partner and the investors as limited partners. This second partnership, 14th P.A., was to acquire a 49-percent interest in Medway. The petitioners were informed of this change by a

letter from Young dated December 29, 1967, after they had already made their contributions to be limited partners in Medway. The letter stated that the petitioners "are *now* to form a California Limited Partnership known as Fourteenth Property Associates" (emphasis added), and it directed each of them to "execute the enclosed Limited Partnership Agreement and Certificate of Limited Partnership where indicated." Both documents were dated December 20, 1967. The letter further stated: "there is no substantive change whatever in the investment, only a matter of *simplication* of the transaction." (Emphasis added.)

Medway was formed under the laws of the State of New York on December 28, 1967. Medway's written partnership agreement, entitled "General Partnership Agreement" and dated "as of January 1, 1967," was executed on or about December 28, 1967. The general partners of Medway, their respective contributions to the capital of Medway, and their respective shares in the profits, losses, and distributions of Medway were stated in the agreement to be as follows:

| General partners | Percentage | Capital contribution |
| --- | --- | --- |
| Roderick H. Cushman............... | 50 | $9,747.71 |
| Charles F. MacGill (MacGill)..... | 1 | 98.46 |
| 14th P.A................................ | 49 | [6]0 |

Cushman, MacGill, and Young, allegedly acting on behalf of 14th P.A., executed an instrument captioned "Business Certificate for Partners," dated December 20, 1967, which stated that they were conducting business as members of a partnership known as "Medway Associates." The certificate was recorded with the New York County Clerk on December 28, 1967.

The mortgage indenture required that Medway execute an agreement to be bound by the terms of the lease. This was not done until January 12, 1970, when Medway executed an "Assumption Agreement" in which it: (1) Assumed certain obligations of Fourth Cavendish as required by the terms of the mortgage indenture; and (2) confirmed the power of the trustee

---

[6]It is apparent that the recital in Medway's partnership agreement that 14th P.A. contributed no capital is inconsistent with any purported purchase by 14th P.A. of a capital interest in Medway.

to act as attorney-in-fact and agent of the lessor to accept the lessee's offer to purchase the property as set forth in section 3.13 of the mortgage indenture. Medway specifically disclaimed any liability for payment of the principal, interest, and prepayment penalty, if any, due on the mortgage notes, or any other financial obligation imposed on the lessee pursuant to the lease.

Medway has never had any bank accounts, and its partners have never valued the interest of each partner which is required by the partnership agreement to be done annually. The combined contributions of Cushman and MacGill, in the amount of $9,846.17, represented the total expenses they incurred including legal fees, printing costs, and various other charges in promoting the Medway transaction.

Fourteenth P.A. is a limited partnership formed on December 28, 1967. At some point, it acquired a 49-percent interest in Medway. Fourteenth P.A. is composed of one general partner, JRYA, and five individual limited partners. The partners in 14th P.A., the amount of capital contributed by each of them, and their percentage interests in the partnership are as follows:

| Name | Percentage | Capital contribution |
|---|---|---|
| General partner: | | |
| Jack R. Young & Associates.. | 0 | 0 |
| Limited partners: | | |
| DeSales G. DuVigneaud........ | 20 | $36,000 |
| Matthew C. Gleason............. | 20 | 36,000 |
| Joseph C. Hayward.............. | 20 | 36,000 |
| Raymon E. Lawton.............. | 20 | 36,000 |
| Theodore E. Marvis.............. | 20 | 36,000 |
| Total................................. | 100 | 180,000 |

The above-named limited partners in 14th P.A. are all petitioners joined in this proceeding. The disposition of the $180,000 capital contribution is discussed *infra*.

During the years 1967 and 1968, the limited partners in 14th P.A., through their general partnership interest in Medway, and the other two general partners in Medway, Cushman and MacGill, took advantage of the losses generated by the property. (MacGill also worked in the real estate department of Wood, Struthers.) Sometime in 1969, Cushman decided that most of the remaining interest in the property should be sold to investors. Again, Young was responsible for marketing these interests. To

effect these sales, two additional limited partnerships were established: Grenada, to which Cushman transferred most of his interest in Medway, and 37th P.A. By effecting the transaction through two partnerships, Cushman retained control of a 51-percent interest in Medway. The ultimate investors were members of 37th P.A. as limited partners.

Cushman had a 50-percent general partnership interest in Medway prior to the formation of Grenada. By an agreement stated to be "made as of January 1, 1969" between Cushman, MacGill, 14th P.A., and Grenada, Cushman agreed to transfer and assign to Grenada 99 percent of his capital account in Medway and a 49.5-percent interest in the profits, losses, and distributions in Medway "for $1.00 and other good and valuable consideration" to be paid by Grenada. This agreement was not ready for execution until after October 15, 1969. The agreement amended the Medway partnership agreement so that the partners of Medway, their capital contributions, and their percentage interests in the partnership, were as follows:

| General partners | Percentage | Capital contribution |
|---|---|---|
| Roderick H. Cushman | 0.5 | $5,097.71 |
| Charles F. MacGill | 1.0 | 98.46 |
| 14th P.A. | 49.0 | 110,000.00 |
| Grenada Associates | 49.5 | 0 |

The balance of Cushman's capital account in Medway as of January 1, 1969, was a deficit in the amount of $142,598. Medway transferred 98 percent of Cushman's capital account, in the amount of ($139,746), to Grenada, and in its partnership return of income for 1969, Medway showed an adjustment to basis of partnership property pursuant to section 743 of the Internal Revenue Code. By reason of this adjustment, Medway, in its 1969 partnership return, reflected an additional cost of the property in the amount of $139,746.[7] Medway then allocated this adjustment to basis as follows: (1) Medway's basis in the land was increased by $8,798.38, and (2) Medway's basis in the store was increased by $130,947.35, which was then depreciated using

---

[7]Medway did not file a separate election to adjust the basis of the partnership property but did indicate on the depreciation schedule of its 1969 return that a basis adjustment was being used in calculating the depreciation on property acquired on Jan. 1, 1969.

the 150-percent declining balance method and a 30-year life for the building. No consideration was received by Medway with respect to the interest in Medway transferred to Grenada since Grenada received its interest in Medway by a direct assignment from Cushman.

Grenada is a limited partnership formed under the Connecticut Limited Partnership Act[8] sometime after October 15, 1969. The partnership is composed of one individual general partner, Cushman, and one limited partner, 37th P.A. The amount of capital contributed by each of the parties and their percentage interest in the partnership is as follows:

| Name | Percentage | Capital contribution |
|---|---|---|
| General partner: | | |
| Roderick H. Cushman | 1 | 0 |
| Limited partner: | | |
| 37th P.A. | 99 | $95,000 |

The formation of Grenada was evidenced by an instrument entitled "Limited Partnership Agreement of Grenada Associates" with an appendix entitled "Certificate of Limited Partnership of Grenada Associates." The agreement states that it was made as of January 1, 1969, although it was not ready for execution until sometime after October 15, 1969. Petitioners failed to file a copy of the certificate with the Town Clerk of New Haven, Conn.

The $95,000 capital contribution made by 37th P.A. to Grenada (see below) was, in turn, paid to Cushman.

Thirty-seventh P.A. is a limited partnership formed in 1969 with one general partner, JRYA, and 10 individual limited partners.

Prior to the formation of 37th P.A., each of the petitioners who purchased an interest in 37th P.A. signed a 1-page commitment letter and returned it to JRYA. By its terms, each of said petitioners agreed to contribute $15,500 for the purchase of a 10-percent interest in "A Limited Partnership[,] to be formed substantially according to the attached agreement[,which] will acquire title to 49% of Medway Associates." The $15,500 payments by those petitioners who became limited

---

[8]Conn. Gen. Stat. Ann. secs. 34–9 and 34–10 (West 1969).

partners in 37th P.A. for 10-percent interests therein were deposited in a trust account, established by JRYA, on the following dates:

| Name | Percentage | Capital contribution | Date of contribution |
|---|---|---|---|
| General partner: | | | |
| Jack R. Young & Associates | 0 | 0 | |
| Limited partners: | | | |
| Edward R. Bloomquist ........ | 10 | $15,500 | June 12, 1969 |
| Philip E. Hilton................. | 10 | 15,500 | Dec. 19, 1969 |
| Daniel M. Martin............... | 10 | 15,500 | May 19, 1969 |
| DeVere W. McGuffin.......... | 10 | 15,500 | May 16, 1969 |
| Louis L. Smith.................. | 10 | 15,500 | May 19, 1969 |
| Chester D. Wahlen............. | 10 | 15,500 | May 29, 1969 |
| Henry S. Wong.................. | 10 | 15,500 | May 22, 1969 |
| Norman S. Wong............... | 10 | 15,500 | May 22, 1969 |
| Theodore S. Wong............. | 10 | 15,500 | May 22, 1969 |
| Carl B. Younger................ | 10 | 15,500 | (not reflected in the record) |
| Total .......................... | 100 | 155,000 | |

All of the above-named limited partners in 37th P.A., with the exception of Carl B. Younger, are petitioners joined in this proceeding. The disposition of the $155,000 capital contribution is discussed *infra*.

The formation of 37th P.A. was evidenced by two documents: an "Agreement of Limited Partnership Thirty-Seventh Property Associates" and "Certificate of Limited Partnership of Thirty-Seventh Property Associates." Language in both documents states that they were executed on January 1, 1969, although neither document was signed by Kenneth E. Darling, the then president of JRYA, until September 16, 1969. The limited partners of 37th P.A. signed the documents between September 23 and December 29, 1969. The certificate was recorded with the San Diego County Recorder on December 30, 1969.

## C. *The Lease*

The lease, which is dated "as of December 1, 1967," was not in fact executed on behalf of Broadway until December 16, 1967, and was not exchanged between the parties until December 20, 1967, at the time of the second closing. It was executed on behalf of Fourth Cavendish on December 15, 1967.

The lease, commonly known as a bond-type lease, is prior in

right to the mortgage lien. The insurance companies lent money to Fourth Cavendish on the strength and security of the lease. The interest rate of 5⅛ percent charged by the insurance companies on the mortgage notes was tied to the credit rating of Broadway.

Annual rentals were calculated without regard to a fair market value rental. Annual rentals for the initial 30-year term were $198,603.75, or 6.33 percent of the purchase price of $3,137,500 paid by Fourth Cavendish to Broadway. This figure was calculated to provide that amount of cash flow necessary to satisfy interest and principal payments, when due (90 percent of the principal was to be amortized over the initial 30 years) and minor expenses (essentially the trustee's commission) amounting to approximately $200 to $300 per year. As to the first renewal term of 23 years, the lease provides annual rentals of $47,062.50, or 1½ percent of the purchase price, and for the second and third renewal periods of 23 and 22 years, respectively, the lease provides for annual rentals of $31,375, which is 1 percent of the purchase price. All the parties expected that the 10-percent balloon payment due at the end of the initial 30-year term would be financed, and future rentals would be about the amount necessary to pay off this financing.

Rents are to be paid directly to the trustee and are applied to the extent required to service the loan.

The terms of the lease and the stimultaneous nature of the sale and leaseback are such that Broadway's status vis-a-vis the land and building underwent no appreciable change after the sale-leaseback was effected. Possession of the property was never actually transferred to Fourth Cavendish or the partnerships. The 30-year lease, with renewable options of up to an additional 68 years, executed contemporaneoulsy with the sales agreement, left Broadway in possession of the property, with the right to use the property for virtually any lawful purpose. To the same extent as any owner would be, Broadway continues to be liable under the lease for the payment of taxes, assessments, charges, and levies of all kinds. Broadway is required, at its own expense, to keep and maintain the premises in good order, condition, and repair, waiving "the right to perform such construction, or to make repairs at the expense of Lessor which may be provided for in any law now in effect or hereafter enacted." It is also required at its own expense to maintain

casualty and liability insurance and to save the lessor "harmless from and against all liabilities, losses, obligations, claims, damages, penalties, causes of action, suits, costs and expenses, " related to the property, which may arise or become due during the term of the lease.

The lease gives Broadway the right to terminate the lease in the event of a total destruction or condemnation of the property. Prior to termination under these circumstances, Broadway must give notice of an intent to terminate the lease. Such notice is to be accompanied by an irrevocable offer by Broadway to pay an amount equal to the unpaid principal plus interest. The lessor then has 30 days within which to accept or reject the offer. If the lessor accepts the offer, Broadway is entitled to the insurance proceeds or the condemnation award, as the case may be, as well as any remaining portion of the property. If the lessor rejects the offer, the lease and Broadway's obligations under the lease are terminated, and the lessor is entitled to the proceeds of the insurance or condemnation award.

In the event of partial destruction or a partial taking by condemnation, the insurance or condemnation awards are first to be applied to restoration of the property (if possible). Any balance of insurance proceeds are then to be paid to Broadway. Any balance of the condemnation award, if in excess of $25,000, is to be retained by the lessor, and rent payments are to be reduced by a fraction, the numerator of which is the amount of such balance and the denominator of which is the original purchase price of $3,137,500. If the outstanding balance of the insurance proceeds is less then $25,000, it is all to be paid to Broadway.

Except for the condemnation and destruction clauses, Broadway's obligation to pay the rent is absolute. The lease cannot be terminated, and rent is not abated by reason of, among other things, damage to the property, any restriction or prevention of or interference with any use of the property, any title defect or encumbrance, any claim that Broadway might have against Fourth Cavendish or its assignees, or any other occurrence.

Section 21 of the lease reads as follows:

21. Sale or Other Transfer of Property:

If during the term of this Lease, Lessor shall receive from a party other than Lessee a bona fide offer to puchase the Property and shall determine to sell the Property to such offeror (or shall offer such interest for sale and shall

receive a bona fide acceptance of such offer), Lessor shall notify Lessee in writing of such proposed sale, stating the purchase price and the other terms thereof. In such event Lessee shall have the right to purchase the interest of Lessor in the Property for a purchase price of $50,000 subject to the Indenture and the Assignment of Lease and Agreement, dated as of the date hereof, among Lessor, Fidelity Union Trust Company and S.A. Clark, as trustees, and Lessee. Such right to purchase shall be exercised by written notice to Lessor within 30 days from the date of receipt by Lessee of Lessor's notice of proposed sale. If Lessee exercises the right to purchase the Property as above provided, such purchase shall be made in accordance with the terms and provisions set forth in section 23, except that such purchase and the instruments of conveyance shall be subject to the Indenture and such Assignment of Lease and Agreement, and this Lease shall remain in full force and effect and the provisions of Section 35 relating to non-merger shall be applicable.

Section 26(a) of the lease reads in part as follows:

26. Assignments, etc., by Lessee:

(a) Except as otherwise provided in this section 26, during the original term hereof the interest of Lessee in this Lease may not be assigned or otherwise transferred by Lessee and no part of the Property may be sublet, without in each case the prior written consent of Lessor and Assignee. * * *

Broadway did not relinquish its right to make alterations or additions or to purchase and install new personal property, trade fixtures, or equipment.

Alterations and additions become the property of the lessor. Newly installed equipment and trade fixtures remain the property of Broadway and may be removed at any time. Broadway's right to make alterations is not unfettered: no alterations can change the general character or reduce the fair market value of the property, and, if the estimated cost of the alteration or addition exceeds $100,000, the alteration or addition must be made under the supervision of an architect and in accordance with plans submitted to and approved by the lessor.

Broadway may place the burden of major improvements, that is, improvements costing in excess of $500,000, on the lessor by requesting the lessor to reimburse Broadway for such expenditures. Funding for such improvement is to be raised by selling notes of Fourth Cavendish, and the rent payments are to be raised appropriately. The increased rent would not necessarily bear any relationship to fair market value; the increase is to be calculated on a basis that would permit the payment of all interest and principal and prepayment premium.

## D. *Marketing Partnership Shares*

In the late fall of 1967, Young conducted a series of meetings for physicians in the San Diego area relative to their participation in the Medway and 14th P.A. transactions. At those meetings, Young presented a general description of the Bakersfield transaction based almost entirely on information obtained from Cushman during telephone conversations. Most of the documentation which JRYA made available to the petitioners concerning the formation of 14th P.A. and 37th P.A. was first obtained from Cushman well after the petitioners had purchased their partnership interests.

JRYA also utilized outside salesmen who relied on a brief resume of each syndication to sell interests in the limited partnerships in which JRYA was involved. All salesmen, including Young, were paid a 12½-percent commission. Neither Young nor Cushman obtained a market analysis as to the economic merits of the transaction from the point of view of the investors.

The two basic materials distributed by Young to the petitioners prior to selling them their partnership interests were individual letters of commitment drafted by JRYA which were used to confirm the terms of the basic agreement and 2-page forecasts of operation with the accompanying accountants' letters prepared by a national accounting firm and based upon information supplied by Young. The letters stated that under the terms of the lease with Broadway, the rental value of the building on the Bakersfield property will be "substantially exhausted in the primary term of 30 years."

Young distributed the forecasts of operation to all of the petitioners who eventually purchased a partnership interest from him; he was not aware of the practices followed by the outside salesmen representing JRYA. The first forecast, dated November 7, 1967, and sometimes hereinafter referred to as the 1967 Accountants' Forecast,[9] was prepared for use by JRYA in

---

[9]The figures upon which the forecasts are premised are not strictly accurate for two reasons: first, the accountants assumed that the mortgage principal would be $3,100,000 rather than the actual amount of $3,137,000, with a corresponding increase in the rental payments. Second, the annual "Trustee's Fees" were approximately $292 rather than $200.

The 1967 Accountants' Forecast was prepared for individuals who were expected to purchase a one-third interest in 14th P.A.'s 49-percent interest in Medway. Young decided to sell equal shares in 14th P.A. to five individuals, and for this reason, the losses to be realized by a holder

selling limited partnership interests in 14th P.A. and reads as shown in tables I & II on pp. 330–331.

The second forcast, dated May 1, 1969, and sometimes hereinafter referred to as the 1969 Accountants' Forecast, was prepared for use by JRYA in selling limited partnership interests in 37th P.A.[10] It was prepared for individuals who were expected to purchase a 10-percent interest in 37th P.A.'s indirect 49-percent interest (or 37th P.A.'s 99-percent interest in Grenada's 49.5-percent interest) in Medway. The 1969 Accountants' Forecast reads as shown in tables III & IV on p. 332.

Young recognized, at the time 14th P.A. was formed, that by the end of 30 years, the Bakersfield store would be "somewhat antiquated." He felt that the property would have a substantial residual value, but he did not consult any outside real estate experts as to the potential of the property as a real estate investment, since, as he put it, any such advice would have required a "crystal ball." Young was also aware, at the time, of the tax advantages to be derived by the limited partners in 14th P.A. At the time 14th P.A. was formed, he also envisioned the possibility of refinancing the property at a lower interest rate in 10 or 12 years. Since the interest rate had, at about the time the limited partnership interests were sold, recently risen by a quarter of a point, from $4\frac{7}{8}$ percent to $5\frac{1}{8}$ percent, and had been down around $4\frac{1}{4}$ percent at some previous time, he felt this rate would drop below 5 percent by 1980. Young told some of the petitioners that he expected to sell the property by 1980.

Young either sold the limited partnerships to the petitioners who are members of 14th P.A. or participated in the initial

---

of a one-fifth interest in a 49-percent interest in Medway were "penciled in" under a column headed "⅕ of 49%" on page 2 of the forecast.

[10]The accountants' letter accompanying the 1969 Accountants' Forecast set forth the information used and the assumptions made in preparing the Forecast. The information included a simplified balance sheet for Medway and other information obtained from Young concerning depreciation on the store, mortgage amortization, and lease income renewal options. The income tax calculations were said to be based upon the position of an investor having taxable income in the amount of $50,000 prior to deducting his share of the partnership loss. The accountants assumed the investor would file a joint return at 1969 Federal and California income tax rates, including a 5-percent Federal surcharge for 1969. In preparing the forecasts, the accountants relied upon schedules of indicated profit and loss made available to them by JRYA. At the time the accountants prepared the 1967 Forecast, they did not have available a copy of the lease, the mortgage indenture, or other documents reflecting the details of the sale-leaseback transaction between Broadway and Fourth Cavendish. The accountants were aware that JRYA and Young would show these forecasts to prospective participants in partnerships to be formed.

## TABLE I

MEDWAY ASSOCIATES (a partnership)

### FORECAST OF OPERATIONS

| | | |
|---|---|---|
| PROPERTY COST<br>& DEPRECIATION | $196,329<br>2,920,000<br>3,116,329 | Land—not depreciable<br>Building—33⅓-year life, 200% declining balance<br>method, changing to straight-line method (no salvage value) in 1982. (Change requires prior approval of the Internal Revenue Service.) |
| FINANCING | 3,100,000 | 30-year mortgage notes, 5⅛% interest, payable $48,986 quarterly beginning January 1968; unamortized balance of $310,000 payable January 1998. |
| LEASE TERM<br>& RENTAL | <br>196,230 | 30-year term<br>Annual rental, payable quarterly in advance beginning January 1968<br>23-year first renewal option—$46,740 annual rental<br>23-year second renewal option—$31,160 annual rental<br>22-year third renewal option—$31,160 annual rental |
| OCCUPANCY DATE | | Feb. 27, 1967 |

MORTGAGE AMORTIZATION

| | Lease income | Interest | Principal | Balance | Depreciation | Mortgage interest | Trustee's fees | Taxable income (loss) |
|---|---|---|---|---|---|---|---|---|
| 1967 (10 months) | | | | | $146,000 | | | ($146,000) |
| 1968 | $196,230 | $116,891 | $79,051 | $3,020,949 | 166,440 | $116,891 | $200 | (87,301) |
| 1969 | 196,230 | 154,027 | 41,915 | 2,979,034 | 156,454 | 154,027 | 200 | (114,451) |
| 1970 | 196,230 | 151,837 | 44,105 | 2,934,929 | 147,066 | 151,837 | 200 | (102,873) |
| 1971 | 196,230 | 149,533 | 46,409 | 2,888,520 | 138,242 | 149,533 | 200 | (91,745) |
| 1972 | 196,230 | 147,108 | 48,834 | 2,839,686 | 129,948 | 147,108 | 200 | (81,026) |
| 1973 | 196,230 | 144,567 | 51,375 | 2,788,311 | 121,151 | 144,567 | 200 | (70,688) |
| 1974 | 196,230 | 141,872 | 54,070 | 2,734,241 | 114,821 | 141,872 | 200 | (60,663) |
| 1975 | 196,230 | 139,048 | 56,894 | 2,677,347 | 107,933 | 139,048 | 200 | (50,951) |
| 1976 | 196,230 | 136,075 | 59,867 | 2,617,480 | 101,456 | 136,075 | 200 | (41,501) |
| 1977 | 196,230 | 132,948 | 62,994 | 2,554,486 | 95,369 | 132,948 | 200 | (32,287) |
| 1978 | 196,230 | 129,657 | 66,285 | 2,488,201 | 89,647 | 129,657 | 200 | (23,274) |
| 1979 | 196,230 | 126,193 | 69,749 | 2,418,452 | 84,268 | 126,193 | 200 | (14,431) |
| 1980 | 196,230 | 122,550 | 73,392 | 2,345,060 | 79,212 | 122,550 | 200 | (5,732) |
| 1981 | 196,230 | 118,715 | 77,227 | 2,267,833 | 67,358 | 118,715 | 200 | 9,957 |
| 1982 | 196,230 | 114,681 | 81,261 | 2,186,572 | 65,154 | 114,681 | 200 | 16,195 |
| 1983 | 196,230 | 110,436 | 85,506 | 2,101,066 | 65,154 | 110,436 | 200 | 20,440 |
| 1984 | 196,230 | 105,968 | 89,974 | 2,011,092 | 65,154 | 105,968 | 200 | 24,908 |
| 1985 | 196,230 | 101,268 | 94,674 | 1,916,418 | 65,154 | 101,268 | 200 | 29,608 |
| 1986 | 196,230 | 96,322 | 99,620 | 1,816,798 | 65,154 | 96,322 | 200 | 34,554 |
| 1987 | 196,230 | 91,117 | 104,825 | 1,711,973 | 65,154 | 91,117 | 200 | 39,759 |

Reference is made to the accompanying accountants' letter.

TABLE II

MEDWAY ASSOCIATES (a partnership)

INDIVIDUAL PARTNER'S TAX PROJECTION

| | 1/5 of 49% | 1/3 of 49⅓% | |
|---|---|---|---|
| PARTNERSHIP INTEREST | | | |
| COST OF INTEREST | $1,600 | $2,667 | Allocated to partnership capital |
| | 34,400 | 57,333 | Allocated to managing partner for services—see (A) below |
| | 36,000 | 60,000 | Total cost |
| TAX ASSUMPTIONS | | 100,000 | Taxable income, joint returns |
| | | | 1967 Federal and California tax rates |

| | Share of indicated income (loss) | Adjusted taxable income | Income tax savings (loss) | | Increase (decrease) in spendable income | | Equity increase | |
|---|---|---|---|---|---|---|---|---|
| | | | Federal | State | Annual | Cumulative | Annual | Cumulative |
| 1967 | $14,600 | ($23,850) | $18,817 | $41,130 | $7,930 | $49,060 | | |
| (A)¹ | 34,400 | (57,333) | | | | | | |
| 1968 | 8,730 | (14,260) | 85,740 | 8,510 | 1,430 | 9,940 | $59,000 | $12,910 |
| 1969 | 11,445 | (18,690) | 81,310 | 11,080 | 1,870 | 12,950 | 71,950 | 6,850 | $19,760 |
| 1970 | 10,287 | (16,800) | 83,200 | 9,980 | 1,680 | 11,660 | 83,610 | 7,200 | 26,960 |
| 1971 | 9,175 | (14,980) | 85,020 | 8,930 | 1,500 | 10,430 | 94,040 | 7,580 | 34,540 |
| 1972 | 8,103 | (13,230) | 86,770 | 7,910 | 1,320 | 9,230 | 103,270 | 7,980 | 42,520 |
| 1973 | 7,069 | (11,550) | 88,450 | 6,930 | 1,150 | 8,080 | 111,350 | 8,390 | 50,910 |
| 1974 | 6,066 | (9,910) | 90,090 | 5,950 | 990 | 6,940 | 118,290 | 8,830 | 59,740 |
| 1975 | 5,095 | (8,320) | 91,680 | 4,990 | 830 | 5,820 | 124,110 | 9,290 | 69,030 |
| 1976 | 4,150 | (6,780) | 93,220 | 4,070 | 680 | 4,750 | 128,860 | 9,780 | 78,810 |
| 1977 | 3,229 | (5,270) | 94,730 | 3,160 | 530 | 3,690 | 132,550 | 10,290 | 89,100 |
| 1978 | 2,374 | (3,800) | 96,200 | 2,280 | 380 | 2,660 | 135,210 | 10,830 | 99,930 |
| 1979 | 1,443 | (2,360) | 97,640 | 1,420 | 240 | 1,660 | 136,870 | 11,390 | 111,320 |
| 1980 | 573 | (940) | 99,060 | 560 | 90 | 650 | 137,520 | 11,990 | 123,310 |
| 1981 | 1,630 | 101,630 | (1,010) | (160) | (1,170) | 136,350 | 12,610 | 135,920 |
| 1982 | 2,640 | 102,640 | (1,640) | (260) | (1,900) | 134,450 | 13,270 | 149,190 |
| 1983 | 3,840 | 103,340 | (2,070) | (330) | (2,400) | 132,050 | 13,970 | 163,160 |
| 1984 | 4,070 | 104,070 | (2,520) | (410) | (2,930) | 129,120 | 14,690 | 177,850 |
| 1985 | 4,840 | 104,840 | (3,000) | (480) | (3,480) | 125,640 | 15,460 | 193,310 |
| 1986 | 5,640 | 105,640 | (3,500) | (560) | (4,060) | 121,580 | 16,270 | 209,580 |
| 1987 | 6,490 | 106,490 | (4,020) | (650) | (4,670) | 116,910 | 17,120 | 226,700 |

¹(A)—Allocation of capital account to general partner for services.
Reference is made to the accompanying accountants' letter.

TABLE III

FORECAST OF OPERATIONS

MEDWAY ASSOCIATES (49 percent partnership interest)

| | Lease income | Amortization | | | Depriciation | Trustee's fees | Total deductions | Indicated loss | 49 Percent interest |
| | | Balance | Principal | Interest | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1969 | $198,604 | $3,014,977 | $42,516 | $155,888 | $173,296 | $200 | $329,384 | ($130,780) | ($64,082) |
| 1970 | 198,604 | 2,970,241 | 44,736 | 153,668 | 161,740 | 200 | 315,608 | (117,004) | (57,332) |
| 1971 | 198,604 | 2,923,169 | 47,072 | 151,332 | 150,959 | 200 | 302,491 | (103,887) | (50,905) |
| 1972 | 198,604 | 2,873,633 | 49,536 | 148,868 | 140,894 | 200 | 289,962 | (91,358) | (44,765) |
| 1973 | 198,604 | 2,821,505 | 52,128 | 146,276 | 131,501 | 200 | 277,977 | (79,373) | (38,893) |
| 1974 | 198,604 | 2,766,657 | 54,848 | 143,556 | 122,734 | 200 | 266,490 | (67,886) | (33,264) |
| 1975 | 198,604 | 2,708,961 | 57,696 | 140,708 | 114,551 | 200 | 255,459 | (56,855) | (27,859) |
| 1976 | 198,604 | 2,648,289 | 60,672 | 137,732 | 106,914 | 200 | 244,846 | (46,242) | (22,659) |
| 1977 | 198,604 | 2,584,513 | 63,776 | 134,628 | 99,786 | 200 | 234,614 | (36,010) | (17,645) |
| 1978 | 198,604 | 2,517,505 | 67,008 | 131,396 | 93,133 | 200 | 224,729 | (26,125) | (12,801) |
| 1979 | 198,604 | 2,447,137 | 70,368 | 128,036 | 86,924 | 200 | 215,160 | (16,556) | (8,112) |
| 1980 | 198,604 | 2,373,281 | 73,856 | 124,548 | 81,129 | 200 | 205,877 | (7,273) | (3,564) |

Reference is made to the accompanying accountants' letter.

TABLE IV

INDIVIDUAL PARTNER'S TAX PROJECTION—10 PERCENT INTEREST

MEDWAY ASSOCIATES (49 percent partnership interest)

| | | Share of indicated loss | Adjusted taxable income | Income tax savings | | Increase in spendable income | | Indicated principal payment | |
| | | | | Federal | State | Annual | Cumulative | Annual | Cumulative |
|---|---|---|---|---|---|---|---|---|---|
| 1969 | | $6,408 | $28,092 | $10,420 | $2,190 | $12,610 | $2,083 | | |
| | (A)[1] | 15,500 | | | | | | | |
| 1970 | | 5,733 | 44,267 | 2,870 | 570 | 3,440 | $16,050 | 2,192 | $4,275 |
| 1971 | | 5,091 | 44,909 | 2,550 | 510 | 3,060 | 19,110 | 2,307 | 6,582 |
| 1972 | | 4,477 | 45,523 | 2,240 | 450 | 2,690 | 21,800 | 2,427 | 9,009 |
| 1973 | | 3,889 | 46,111 | 1,940 | 390 | 2,330 | 24,130 | 2,554 | 11,563 |
| 1974 | | 3,326 | 46,674 | 1,660 | 330 | 1,990 | 26,120 | 2,688 | 14,251 |
| 1975 | | 2,786 | 47,214 | 1,390 | 280 | 1,670 | 27,790 | 2,827 | 17,078 |
| 1976 | | 2,266 | 47,734 | 1,130 | 230 | 1,360 | 29,150 | 2,973 | 20,051 |
| 1977 | | 1,765 | 48,235 | 880 | 180 | 1,060 | 30,210 | 3,125 | 23,176 |
| 1978 | | 1,280 | 48,720 | 640 | 130 | 770 | 30,980 | 3,283 | 26,459 |
| 1979 | | 811 | 49,189 | 400 | 80 | 480 | 31,460 | 3,448 | 29,907 |
| 1980 | | 356 | 49,644 | 180 | 40 | 220 | 31,680 | 3,619 | 33,526 |

[1](A)—Allocation of capital account to general partner for services. Reference is made to the accompanying accountants' letter.

interviews with said individuals. Young sold interests in 14th P.A. to petitioners Gleason, Hayward, and Lawton; he participated in the initial interviews with petitioners DuVigneaud and Marvis. He participated in the interviews with some of the potential participants in 37th P.A.

Stanley Robison was the part-time office manager for approximately six groups of associated physicians and surgeons in the Los Angeles area. Robison was in contact with Young and discussed possible participation in 14th P.A. and 37th P.A. with a number of physicians and surgeons who acquired interests therein.

Earl J. Reeve was a real estate broker who sold interests in 37th P.A. as an outside commission salesman for JRYA. The only information which he had available to him when he discussed participation in 37th P.A. with prospective participants was the 1969 Accountants' Forecast and the accompanying accountants' letter.

Each of the petitioners who purchased an interest in 14th P.A. signed a 2-page commitment letter and returned it to JRYA. By its terms, each of said petitioners agreed to contribute $36,000 for the purchase of a 9.8-percent interest in a limited partnership to be known as Medway Associates. The commitment letter contained the following paragraph:

> In the event Broadway-Hale objects to a proposed transfer of any property by the lessors then Broadway-Hale may terminate the lease and purchase the property at a price sufficient to prepay the outstanding notes plus $50,000.

Each of the petitioners who purchased an interest in 37th P.A. signed a 1-page commitment letter and returned it to JRYA. By its terms, each of said petitioners agreed to contribute $15,500 for the purchase of a 10-percent interest in "A Limited Partnership[,] *to be formed* substantially according to the attached agreement[, which] will acquire title to 49% of Medway Associates." (Emphasis added.)

Petitioners' $15,500 payments for 10-percent interests in what eventually became 37th P.A. were deposited in a trust account, established by JRYA, on the following dates:

| Petitioners | Date | Petitioners | Date |
|---|---|---|---|
| Martin | May 19, 1969 | Bloomquist | June 12, 1969 |
| McGuffin | May 16, 1969 | Wahlen | May 29, 1969 |
| Smith | May 19, 1969 | Hilton | Dec. 19, 1969 |
| Wongs | May 22, 1969 | | |

### E. *Compensating the Promoters*

The limited partners of 14th P.A. paid $180,000 for their interests. Of this amount, $70,000 was allocated to the capital account of JRYA and then withdrawn by JRYA in 1967 as compensation for services.[11] The remaining $110,000 of the capital contributions made to 14th P.A. by its limited partners was, in turn, paid by 14th P.A. as its capital contribution to Medway. Medway, in turn, paid the entire $110,000 to Cushman in 1967. Of that amount, $105,350 was treated as a salary payment to Cushman. The difference in the amount of $4,650 was treated as a withdrawal from Cushman's capital account, leaving a balance in that account of $5,097.71. The withdrawal of capital was made without any prior unanimous agreement of the partners, in violation of the terms of the partnership agreement.

The limited partners of 37th P.A. paid a total of $155,000 for their interests in 1969. Of this amount, $60,000 was allocated to the capital account of JRYA and then withdrawn by JRYA in 1969 as compensation for services, including commissions. The remaining $95,000 of capital contributed by the limited partners in 37th P.A. was, in turn, paid by 37th P.A. as its capital contribution to Grenada. Grenada, in turn, paid the entire $95,000 to Cushman, allegedly as compensation for past and future services.

The $70,000 paid by 14th P.A. to JRYA in 1967, the $60,000 paid by 37th P.A. to JRYA in 1969, and the $95,000 paid by Grenada to Cushman in 1969 were deducted as salaries to partners on the respective partnership returns. In addition, in 1967, Medway deducted $215,000 in salary expenses, $212,850 for Cushman and $2,150 for MacGill, although only about one-half of this amount, or $105,350, was paid to Cushman, and nothing was paid to MacGill.

Notwithstanding the substantial sums paid to JRYA, ostensi-

---

[11] As previously indicated, Young and his salesmen each received a 12½-percent commission from JRYA for each sale.

bly for future services, the only significant duty of JRYA, after the formation of the respective partnerships, was to have annual partnership returns prepared. The partnership returns of 14th P.A. for the years 1967 through 1972, as well as the returns of 37th P.A. for the years 1969 and 1972, were prepared by the national accounting firm which prepared the 1967 and 1970 Accountants' Forecasts. In preparing such returns, the accountants simply utilized the data reflected in Medway's and Grenada's partnership returns, multiplying those figures by the appropriate percentages in order to reflect the interests held by 14th P.A. and 37th P.A. JRYA paid the aforementioned accountants a nominal fee, the amount of which cannot be determined from the record, although the amount was not less then $100 for preparing each tax return of 14th P.A. and 37th P.A.

JRYA, as the general partner, was obligated to keep, or to cause to be kept, full and true books of account of 14th P.A. and 37th P.A., in which there would be entered all transactions of the partnership, and annually to transmit to the limited partners financial statements in addition to the annual partnership tax returns. However, such obligations were not fulfilled by JRYA.

No books of account were in fact set up or maintained during the taxable years 1967 through 1969 for 14th P.A. or during the taxable year 1969 for 37th P.A., and no annual financial statements or reports, other than the partnership income tax returns, were sent to the limited partners of 14th P.A. and 37th P.A. The only record JRYA kept was a trust account indicating cash received and disbursed by each partnership. Ultimately, in January or February of 1970, the journal and ledger records of 14th P.A. and 37th P.A. were set up by a different national accounting firm, Touche Ross & Co., which firm had not previously been involved. Touche Ross used the trust account and the tax returns and forecasts of operation prepared by the previous accountants to prepare a set of formal books.

The fees paid to Cushman compensated Cushman for the substantial services he performed in structuring the entire sale and leaseback transaction and in forming and organizing Fourth Cavendish, Medway, and Grenada, and the fees did not serve as compensation for future services. Although Cushman rendered substantial services in structuring the entire transaction and in forming the entities, the major continuing service to be rendered by Cushman was to see to it that the Medway and Grenada tax

returns were prepared and filed. These returns were prepared by the outside accounting firm of Moroney and Donelan who were paid a fee for this service. The fee came from the small excess of the rent payments over the amounts required for debt service, which were originally earmarked for trustees' commissions but were not entirely required for such purpose.

Medway had no formal books of account during the taxable years 1967 to 1970. The accounting records of Medway consisted of annual spread sheets which were prepared by Moroney and Donelan in conjunction with preparing the annual partnership returns of Medway. Grenada had no books of account or other accounting records except for its tax returns.

Other duties of Cushman included maintaining the corporate status of Fourth Cavendish and handling the sale of improvement notes.[12] The former expenses were the expenses of Fourth Cavendish rather than the partnerships'. No portion of the initial investment was intended to compensate Cushman for costs of issuing improvement notes.

### F. *Economics of the Transaction and Expert Witnesses*

Both the petitioners and the respondent retained experts to analyze and testify regarding the economics of the transactions in question.

Respondent's expert, C. Everett Steichen, received a bachelor of arts degree in history from Reed College, Portland, Ore., in 1952 and a master of arts degree in economics from the University of Washington, Seattle, in 1955. Since then, he has been associated with Larry Smith & Co., Ltd., an international real estate consulting firm, for the past 23 years, rising from an analyst in the Seattle, Wash., office to president and, in 1975, to chairman of the executive committee.

Steichen has acted as a consultant with respect to all types of real estate. His work can include the complete panoply of consulting activities focusing on the business aspects of developing a parcel of real estate. Steichen's orientation is toward commercial real estate development rather than the passive investment. The type of individual investor with whom he deals

---

[12]The lease permits Broadway to refinance improvements costing in excess of $500,000, using Fourth Cavendish as a vehicle to sell corporate notes.

is one who owns and actively participates in the development of property. His major clients, numbering over 80 at the time of the trial of this case, have included the largest real estate development company in the United States, a major airline, a major industrial corporation, and several of the largest retailing organizations in the United States and Canada.

In particular, Steichen has devoted a substantial amount of his time to retail properties. His analyses have included advising a developer or investor as to the economic return he or she could expect from a particular property site, evaluating market opportunities and laying out a strategy for store expansion for retail chains, and "retreading" existing shopping centers. The properties have varied in size from individual stores to projects involving thousands of acres. As part of some or all of these projects, Steichen has had to analyze the demographic and socioeconomic characteristics of the surrounding population in order to advise clients on the nature and lifetime of the market, the gross volume that can be expected, and the optimum type and size of tenant for the retail property. Steichen has also advised clients on the suitability of retreading an existing shopping center from an investor's perspective.

Steichen reached the following conclusion regarding petitioners' involvement with the property: "An analysis of this transaction including suitable alternative comparable investment alternatives indicates that with the exception of losses which could be transferred to other income to obtain tax benefits there was no economic foundation for the investments of the limited partners in Fourteenth Property Associates and Thirty-Seventh Property Associates."

Petitioners' expert, Robert J. Lichter, received a bachelor of arts degree economics from the University of Arizona in 1965. He served in the U.S. Navy until sometime in 1968. Thereafter, he took the courses required for, and obtained, a real estate broker's license. After 3 years of brokerage experience, he joined the San Diego office of Coldwell Banker, a real estate consulting firm headquartered in Los Angeles, and worked on a commission basis as a commerical real estate salesman. Because of his prior brokerage experience, Lichter was not required to go through Coldwell Banker's normal training program. His basic training program lasted for approximately 8 weeks and was supplemented by three additional courses taught at 2-week intervals. These

courses included the area of sale-leaseback transactions and discounted yields.

At Coldwell Banker, Lichter dealt with various types of real estate including apartments, stores, shopping centers, and office buildings. In transactions involving larger properties, Lichter would perform the technical work, the yield analysis, and would participate in the presentation to the client under the supervision of the director of Coldwell Banker's investment operation. According to Lichter, Coldwell Banker felt that he was quite competent and for this reason had him travel from San Diego to Los Angeles to represent the firm in important transactions. Lichter's clients included Broadway and a large number of other major corporations.

Lichter opted to change jobs rather than accept a transfer by Coldwell Banker to its Chicago office. On April 1, 1976, he joined John Burnham & Co., a San Diego real estate consulting firm. At the time of trial, Lichter was the manager of John Burnham's Commercial Real Estate Division, which included 38 professional and 7 clerical employees. His work involves the analysis and discussion of potential investments with both buyers and sellers, and in many cases, he represents both the buyer and seller in the same transaction. At the time of trial, he was not a licensed appraiser but was familiar with appraisal techniques. Although Coldwell Banker had its own appraisal staff, John Burnham's appraisal staff was Lichter's responsibility. Lichter had not previously testified as an appraiser or been paid for preparing an appraiser's report.

With this background, Lichter analyzed the economic viability of petitioners' investments in 14th P.A. and 37th P.A. using the discounted yield or internal rate of return method.[13] His instructions were to ignore tax considerations and to look at the entire transaction as if it were a nontaxable event. He concluded: "this transaction under all reasonable assumptions, both pre-tax and after-tax, would have reasonable economic justification."

## G. *Returns*

In its partnership returns for the years 1967 through 1975,

---

[13]This analysis is detailed *infra* at pp. 348–353.

Medway reported the following losses and allocated the losses to the following individuals and partnerships:

| Year | Loss reported | Allocated to Cushman | Allocated to MacGill | Allocated to 14th P.A. | Allocated to Grenada |
|------|------|------|------|------|------|
| 1967 | $378,908 | $189,454 | $3,789 | $185,665 | |
| 1968 | 131,482 | 65,741 | 1,315 | 64,426 | |
| 1969 | 137,184 | 1,306 | 1,306 | 64,013 | $70,559 |
| 1970 | 123,226 | 1,170 | 1,170 | [1]57,332 | 63,554 |
| 1971 | 109,489 | 1,036 | 1,036 | 50,754 | 56,663 |
| 1972 | 97,275 | 917 | 917 | 44,914 | 50,527 |
| 1973 | 84,088 | 788 | 788 | 38,590 | 43,922 |
| 1974 | 72,667 | 676 | 676 | 33,125 | 38,190 |
| 1975[2] | 61,340 | 565 | 565 | 27,669 | 32,511 |

[1] 14th P.A. reported the allocated loss to be $63,554 on its 1970 partnership return.

[2] There is a $30 discrepancy in the figures for this year.

The only item of income reported by Medway in each of its partnership returns for the years 1968 through 1974 was the annual rent payable under the lease in the amount of $198,604 which was, as stated above, paid directly by Broadway to the trustee. Medway did not receive any rental income in 1967 and did not report any income in its partnership return for that year. Medway used a modified cash basis method of accounting in which everything was handled on a cash basis except for interest expense, which was accrued as of the beginning of each quarter to reflect the fact that Medway received rent payments at the beginning of each quarter and was obligated to make interest payments at the end of each quarter.

Medway's partnership agreement does not provide for any special allocation of items of partnership income or loss as between the respective partners. Section "(7)" provides that all profits and losses are to be allocated on the basis of each partner's profit-and-loss sharing ratio. Section "(24)" provides that the provisions of the agreement may not be amended except by written agreement signed by each partner. No such agreement was ever signed. Nevertheless, Cushman and Young, acting together and without authorization from any other person or persons, caused the expense resulting from the money paid to Cushman in 1967 to be allocated to 14th P.A., since all the money for the compensation emanated from 14th P.A. MacGill was never consulted about this arrangement. To reconcile the return and section "(7)" of the Medway partnership agreement,

accountants preparing the 1967 Medway return and acting under the direction of Milton Hecht, an employee of Wood, Struthers, approximately doubled the actual figure for Medway's salary income and expenses so 14th P.A.'s 49 percent would be the $105,350 it paid. Cushman and MacGill, the other two partners in Medway to whom the excess salary expenses were purportedly paid, were not affected by this bookkeeping transaction because they received the newly created offsetting losses.

The 1967 Medway return also indicated that the property was "new property" acquired on February 29, 1967, and claimed depreciation in the amount of $163,908 by using the 200-percent declining balance method and a 30-year life for the Bakersfield store. None of Medway's returns for the years 1967 through 1975 was signed by a representative of Medway: six, including Medway's 1967 return, were signed by Medway's accountants as preparers; three were unsigned, and of those, two contained a preparer's address and social security number, and one contained a blank signature block.

14th P.A.'s returns for the years 1967 through 1972 reflected the following:

| Year | Loss allocated from Medway | 14th P.A. loss reported | Loss allowable to each limited partner in 14th P.A. | Capital account of each limited partner in 14th P.A. |
|------|------|------|------|------|
| 1967 | $185,665 | [1] $255,665 | $51,133 | ($15,133) |
| 1968 | 64,426 | 64,426 | 12,885 | (28,018) |
| 1969 | 64,013 | 64,013 | 12,803 | (40,821) |
| 1970 | [2] 63,554 | 63,554 | 12,711 | (53,532) |
| 1971 | 50,754 | 50,754 | 10,151 | (62,438) |
| 1972 | 44,914 | 44,914 | 8,983 | (71,421) |

[1] Includes a $70,000 deduction for payments to partners.

[2] Medway allocated a loss of $57,332 to 14th P.A. on its partnership return for 1970.

Medway's 1968 partnership return failed to include rental income in the amount of $18,759.66 for the period from December 20, 1967, to January 31, 1968, or an interest expense for the same period and in the same amount.

In its partnership return for the year 1969, Grenada reported the $70,559 loss allocated to Grenada in the 1969 Medway return. Granada also claimed a deduction of $95,000 for payments to partners for a total loss of $165,559. For the years 1970 through

1975, Grenada reported the following losses allocated to Grenada in the Medway returns:

| Year | Loss reported | Year | Loss reported |
|------|--------------|------|--------------|
| 1970 | $63,554 | 1973 | $43,922 |
| 1971 | 56,663 | 1974 | 38,190 |
| 1972 | 50,527 | 1975 | 32,511 |

Only one of Grenada's returns for the years 1969 through 1975 was signed by a representative of Grenada: two were signed by Grenada's accountants as preparers; two contained only a preparer's address and social security number; and two contained a blank signature block. Thirty-Seventh P.A.'s returns reflected the following figures:

| Year | Loss allocated from Grenada | 37th P.A. loss reported | Loss allocated to each limited partner in 37th P.A. | Yearend capital account of each limited partner in 37th P.A. |
|------|------|------|------|------|
| 1969 | $163,903 | [1] $223,903 | $22,390 | ($6,890) |
| 1970 | 62,918 | 62,918 | 6,292 | (13,677) |
| 1971 | 56,096 | 56,096 | 5,609 | (18,792) |
| 1972 | 50,022 | 50,022 | 5,002 | (23,794) |

[1] Includes $60,000 partnership payment.

The partnership losses claimed and taxable income reported by the following petitioners who were limited partners in 14th P.A., and their respective taxable incomes without deduction of said losses are as follows:

| Petitioner | Year | Partnership loss claimed | Taxable income reported | Taxable income without partnership loss claimed |
|------|------|------|------|------|
| DeSales G. DuVigneaud, et ux.. | 1967 | $51,133 | $25,187 | $76,320 |
|  | 1968 | 12,885 | 54,901 | 67,786 |
|  | 1969 | 12,803 |  |  |
|  | 1970 | 12,711 | 50,376 | 63,087 |
| Matthew C. Gleason, et ux | 1967 | 51,133 | (2,744) | 48,389 |
|  | 1968 | 12,885 | 42,013 | 54,898 |
|  | 1969 | 12,803 | 53,361 | 66,164 |
|  | 1970 | 12,711 | 50,741 | 63,452 |
| Joseph C. Hayward, et ux | 1967 | 51,133 | 3,324 | 54,457 |
|  | 1968 | 12,885 | 23,903 | 36,788 |
|  | 1969 | 12,803 | 12,400 | 25,203 |
|  | 1970 | 12,711 | 18,317 | 31,028 |
| Raymond E. Lawton, et ux | 1967 | 51,133 | 19,298 | 70,431 |
|  | 1968 | 12,885 | 46,458 | 59,343 |

| | | | | |
|---|---|---|---|---|
| Raymon E. Lawton | 1969 | 6,401(1/2) | 25,842 | 32,243 |
| | 1970 | 6,356(1/2) | 29,481 | 35,837 |
| Rosellen M. Lawton | 1969 | 6,401(1/2) | 26,542 | 32,943 |
| | 1970 | 6,355(1/2) | 30,106 | 36,461 |
| Theodore E. Marvis, et ux | 1967 | 51,133 | 8,562 | 59,695 |
| Theodore E. Marvis | 1968 | 6,443(1/2) | 20,275 | 26,718 |
| | 1969 | 6,401(1/2) | 26,099 | 32,500 |
| Phyllis H. Marvis | 1968 | 6,443(1/2) | 20,975 | 27,418 |
| | 1969 | 6,401(1/2) | 26,799 | 33,200 |
| Theodore E. Marvis, et ux | 1970 | 12,711 | 57,527 | 70,238 |

The partnership losses claimed and taxable income reported by the following petitioners who were limited partners in 37th P.A., and their respective taxable incomes without deduction of said losses, are as follows:

| Petitioner | Year | Partnership loss claimed | Taxable income reported | Without partnership loss claimed |
|---|---|---|---|---|
| Daniel M. Martin, et ux | 1970 | $6,292 | $78,484 | $84,776 |
| Norman S. Wong, et ux | 1969 | 22,885 | 40,945 | 63,830 |
| | 1970 | 6,292 | 29,655 | 35,947 |
| Theodore S. Wong, et ux | 1969 | 22,885 | 41,670 | 64,555 |
| | 1970 | 6,292 | 33,619 | 39,911 |
| Henry S. Wong | 1969 | 11,443 (1/2) | 18,511 | 29,954 |
| Katie K. Wong | 1969 | 11,442(1/2) | 19,110 | 30,552 |
| Henry S. Wong, et ux | 1970 | 6,291 | 27,962 | 34,253 |
| DeVere W. McGuffin, et ux | 1969 | 22,885 | 50,672 | 73,557 |
| | 1970 | 6,292 | 74,674 | 80,966 |
| Philip E. Hilton, et ux | 1969 | 22,885 | 37,862 | 60,747 |
| | 1970 | 6,292 | 31,190 | 37,482 |
| Louis L. Smith, et ux | 1969 | 22,886 | 3,813 | 26,699 |
| | 1970 | 6,291 | 5,057 | 11,348 |
| Edward R. Bloomquist, et ux | 1969 | 22,886 | 0 | 22,886 |
| | 1970 | 6,292 | 18,794 | 25,086 |
| Chester D. Wahlen, et ux | 1969 | 22,886 | 2,001 | 24,887 |
| | 1970 | 6,292 | 20,402 | 26,694 |

Respondent disallowed the claimed partnership losses in the amounts listed above in determining the deficiencies against petitioners herein.

## OPINION

The principal issue presented for our consideration is whether petitioners are entitled to deduct their distributive shares of

asserted partnership losses arising out of a sale and leaseback transaction.[14] The losses flowed through a series of tiered[15] partnerships and were attributable to payments to partners claimed as deductible expenses and to the excess of interest expense and depreciation over rental income from the property—the subject of the sale and leaseback. The availability of interest and depreciation deductions turns on whether the substance of the sale and leaseback comported with its form; the compensation question turns on whether the payments to promoters constituted deductible prepaid management fees or were payments for past services which must be capitalized.[16]

---

The terms of this sale and leaseback transaction are fairly traditional. In 1964, Broadway, a large department store chain, decided to build a retail department store in a proposed shopping center in Bakersfield, Calif. Although Broadway would provide immediate financing for construction through internal sources, its intention from the start was to obtain long-term financing for the building once it had been completed.

It had been decided that the store would be financed by making use of what has come to be known in the trade as a single-purpose financing corporation, formed and availed of for, and limited to, the sole purpose of facilitating this one transaction. Under this plan, the single-purpose corporation, Fourth Cavendish, would sell its corporate notes to certain insurance company lenders.[17] Broadway would then sell the property to Fourth Cavendish and funds derived from the sale of the notes would be paid to Broadway as the purchase price for the property. Simultaneously with the sale, Fourth Cavendish would

---

[14]Some of the petitioners invested in 14th P.A. while others invested in 37th P.A., but the legal issues herein are identical.

[15]See discussion of the "Multi-Tiered Partnership" in A. Willis, Partnership Taxation, sec. 61–07, p. 181 (2d ed. 1976).

[16]The issues as framed by the parties are stated above in the preamble.

[17]As we have found in the findings of fact, Fourth Cavendish was used as the single vehicle for the sale and leaseback of three stores, including the one in Bakersfield with which we are concerned. However, since the transaction involving each of the three was, in a manner of speaking, hermetically sealed off from, and essentially unrelated to, the other two, we will, for simplicity of expression, deal with Fourth Cavendish in this opinion as though it were the single-purpose corporation for only the Bakersfield property (i.e., the property).

lease the property back to Broadway. In February 1965, commitments were obtained from the insurance companies to provide the financing once the building was completed.

Construction of the store by Broadway was completed in January 1967, and the store was occupied and opened for business in February 1967. Fourth Cavendish was formed on January 17, 1967. The stock of Fourth Cavendish was held in the name of Wood, Struthers, a New York investment firm that served as the intermediary in negotiating the transaction between Broadway and the insurance companies. On December 20, 1967, Fourth Cavendish sold its mortgage notes to the lenders and turned the proceeds over to Broadway as the purchase price for the property.

The entire cost of the purchase was raised by the sale of mortgage notes. Broadway paid the commitment fees and commissions for arranging the sale of the mortgage notes. Fourth Cavendish then transferred the property back to Broadway as lessee under a net lease (the lease) for a 30-year term with options for Broadway to extend for another 68 years.

The mortgage notes were secured by an indenture of mortgage and deed of trust which conveyed Fourth Cavendish's interest in the property to trustees (the trustee) for the insurance companies and by an assignment of the lease and the rentals to the trustee.

The transaction and the lease were structured so that Broadway's relationship vis-a-vis the property remained virtually unchanged. The lease is of the type known in the trade as a "triple net" lease; it absolved Fourth Cavendish and its assignees of any financial obligation relating to the property except the obligation to make monthly principal and interest payments. Even this obligation was structured so that it would place no burden on Fourth Cavendish. Rent payments were calculated to provide the lessor with just enough money to meet the periodic principal and interest payments and expenses incident thereto for the 30-year term that the third-party financing was outstanding. Fourth Cavendish was not required to take the formal step of making the payments. The rent flowed directly to the insurance companies from Broadway.

The transaction was further structured so that when Fourth Cavendish or its assignee completes paying off the financing, rental payments (assuming renewal options are exercised by

Broadway) will be reduced to 1½ percent of the purchase price for the first renewal term of 23 years and to 1 percent of the purchase price for the second and third renewal terms.

At approximately the time that the sale and leaseback was effected in December 1967, Fourth Cavendish transferred its interest in the property to Medway, a general partnership that had just been formed to receive such interest. The partners in Medway were Cushman, holding a 50-percent partnership interest, MacGill, holding a 1-percent interest (both were partners in the Wood, Struthers investment firm), and a limited partnership that had just been formed, 14th P.A., which held a 49-percent interest.

It was to 14th P.A. that some of the petitioners in this case belonged as limited partners. The general partner in 14th P.A. was Jack R. Young & Associates (JRYA). The only contributions to 14th P.A. were made by the limited partners, who also held a 100-percent interest in the profits and losses of that partnership. Of the $180,000 contributed by the limited partners to the partnership, $70,000 was paid by the partnership to the general partner, JRYA, for "services," and the remainder $110,000 was paid to Medway as a capital contribution. Medway in turn paid the $110,000 to Cushman for services.

Fourteenth P.A. had only a 49-percent interest in Medway and thus a 49-percent interest in the property. A 51-percent interest in Medway (and thus the property) continued to be held by Cushman.

In 1969, Cushman and his colleagues decided to dispose of an additional 49-percent interest in Medway. To this end, two additional partnerships were formed. Grenada, a limited partnership, was formed by Cushman on some date after October 15, 1969. To this limited partnership, Cushman transferred all of his interest in Medway except for one-half of a 1-percent retained interest. Cushman was the general partner of Grenada and 37th P.A. was the limited partner. Thirty-seventh P.A. was formed by JRYA, which was the general partner, sometime in 1969. Thirty-seventh P.A. held 99 percent of the interest in Grenada. The limited partners in 37th P.A. contributed $155,000 to 37th P.A., of which $60,000 went to JRYA as a "payment for services" and $95,000 was paid to Grenada as a capital contribution and then paid to Cushman "for services." Most of the limited partners in 37th P.A. are also petitioners in this proceeding.

## Interest and Depreciation Deductions

Notwithstanding the intricacies of the above-described tier partnership labyrinth, the central issue in this case is the bona fides of the sale-leaseback. This is essentially an exercise in substance versus form, and as earlier stated by the Supreme Court, "In the field of taxation, administrators of the law, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering v. Lazarus & Co.*, 308 U.S. 252, 255 (1939). Notwithstanding the approval of the sale-leaseback in the *Frank Lyon* case,[18] we do not understand the teaching of the Supreme Court's decision in that case to be that we are to accept *every* putative sale-leaseback transaction at face value, but rather that our precept is to determine whether there is, in the words of the Supreme Court, "a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–584."[19]

We also recognize, as the Supreme Court made clear in *Frank Lyon,* that a sale-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions. In this connection, implicit in the Supreme Court's opinion is the acceptance of the proposition (a position here argued in the brief amicus curiae) that the seller-lessee's financing requirements may be a valid business purpose to support a sale-leaseback transaction for tax purposes. See Note—"Problems of Judicial Interpretation of Real Estate Sale and Leaseback Taxation:

---

[18]*Frank Lyon Co. v. United States,* 435 U.S. 561 (1978).

[19]The tax consequences of real estate sale-leaseback transactions have been exhaustively analyzed by the courts and commentators, both before and after the *Frank Lyon Co.* decision. Some, but not all, of the cases are: *Estate of Franklin v. Commissioner,* 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); *Sun Oil Co. v. Commissioner,* 562 F.2d 258 (3d Cir. 1977); *American Realty Trust v. United States,* 498 F.2d 1194 (4th Cir. 1974); *Bolger v. Commissioner,* 59 T.C. 760 (1973); *Hill v. Commissioner,* 63 T.C. 225 (1974), affd sub nom. *Tenner v. Commissioner,* 551 F.2d 313 (9th Cir. 1977); *Miller v. Commissioner,* 68 T.C. 767 (1977); *Davis v. Commissioner,* 66 T.C. 260 (1976), affd 585 F.2d 807 (6th Cir. 1978), cert. denied 440 U.S. 981 (1979). See also L. Kaster, "Sale-Leasebacks Economics, Tax Aspects and Lease Terms," Practising Law Institute (1979).

Description, Analysis, and Proposed Revision," 33 Tax Law. 237, 250 (1979).

To recapitulate the foregoing, the transaction before us will not stand or fall merely because it involved a sale-leaseback mandated by Broadway's financing requirements, but rather must be tested to determine whether it (the transaction) (1) is genuinely multiple-party, (2) with economic substance, (3) compelled or encouraged by business realities (no "regulatory" realities are claimed), and (4) is imbued with tax-independent considerations which are not shaped solely by tax-avoidance features. *Frank Lyon Co. v. United States, supra.*

One key element of the above test is the phrase "genuinely multiple-party" for obviously, when looked at only from the viewpoint of Broadway, as seller-lessee, the transaction had economic substance and was encouraged by business realities. Petitioners have claimed in their brief and we have no reason to gainsay them that, had conventional mortgage financing been used, the insurance companies would have lent only 75 percent of the value of the property. The insurance companies, furthermore, had limitations on the total amounts and proportions of their funds that could be committed to direct real estate mortgages. Under the sale-leaseback approach Broadway was, in effect, able to finance 100 percent of the acquisition cost of the property. In addition, the purchase of corporate notes, which were secured by a lease between the corporation and a well-rated tenant, avoided certain other insurance company lending restrictions.

Similarly, Broadway had limitations in its loan and credit agreements with its banks which put a ceiling on the total amount of debt it could incur and also limited the total value of its property which could be mortgaged. At the same time, Broadway expected to be able to deduct as rent, during the initial 30-year term of the lease, an amount equal to 90 percent of the principal amortization and 100 percent of the interest costs of the underlying mortgage on the property. The mortgage contained a 10-percent balloon at the end of the 30-year term.

It is thus apparent that, viewed broadly from the vantage point of Broadway and the insurance companies, the sale-leaseback transaction followed what is essentially a widely used and acceptable business practice embracing substantial business as well as tax purposes and which had significant economic,

nontaxable substance. In this context, we do not deem the existence of a net lease, a nonrecourse mortgage or rent during the initial lease term geared to the cost of interest and mortgage amortization to be, in and of themselves, much more than neutral commercial realities. Furthermore, the fact that the transaction was put together by an "orchestrator" (to use petitioner's term) would not alone prove fatal to the buyer-lessor's cause provided the result is economically meaningful on both sides of the equation. For even before the enactment of the at-risk rules of section 465, equipment-leveraged leases, often "packaged" by brokers, were acceptable to the Commissioner where substantial nontax economic interests were acquired by the buyer-lessor. Rev. Proc. 75–21, 1975–1 C.B. 715.

Overall, considering the involvement of Broadway and the insurance companies, there was at least a two-party aspect to the transaction. We explore subsequently herein, whether the facts, as they did in *Frank Lyon*, disclose a genuine *three*-party aspect.

But what Broadway sees is a reflection from only one polygon of the prism. In the *Frank Lyon* case, the Supreme Court appraised not only the substance of the seller-lessee's interest, but also that of the buyer-lessor and the legal and economic substance of the contractual relationship between the two.

We, therefore, turn now to a consideration of the substance of the buyer-lessor's (i.e., the petitioners') interest, and here the substantiality of that interest, aside from tax considerations, is far less apparent.[20] We must thus inquire: does the buyer-lessor's interest have substantial legal and economic significance aside from tax considerations, or is that interest simply the purchased tax byproduct of Broadway's economically impelled arrangement with the insurance companies?

It would, perhaps, at this point be appropriate to observe that the facts before us closely parallel the rather paradigmatic facts

---

[20]In their brief, petitioners draw attention to the fact that while title to the property is in the Medway partnership as transferee from Fourth Cavendish, there is a traceable claim of ownership to petitioners, and the losses claimed by petitioners are derived from the losses resulting from the ownership of the property by Medway. For convenience, therefore, we will from time to time refer to the petitioners by the generic description "buyer-lessor." We emphasize that, at this point, we are not considering the partnership and other tax questions inherent in the series of steps leading to the acquisition by petitioners of their respective limited partnership interests in 14th P.A. and 37th P.A.

(particularly where State law usury problems are encountered) of *Bolger v. Commissioner*, 59 T.C. 760 (1973). In *Bolger*, however, as we observed in note 5 of our opinion, "Respondent concedes that the leases involved should be recognized as such and makes no argument that the lessees are the ones to whom the benefit of a depreciation deduction should inure. Cf. *Helvering v. Lazarus & Co. [,supra]*" (59 T.C. at 767). Thus, we were there not called upon to scrutinize the leases qua leases.

We further observed in *Bolger* that the Commissioner might have pressed, but did not, the concept that, by virtue of the leases and financing transactions, the single-purpose finance corporations divested themselves (in favor of the lessee and the lenders) of all but bare legal title to the properties there in question. Following this concept to its logical conclusion would then have required a determination either that the single-purpose corporations thereby deprived themselves of any presently depreciable interest or that this right to deduct the cost of the buildings should be by way of amortization over the lease terms. Instead, the Commissioner merely argued that the buyer-lessor corporations retained, after the leaseback, such an interest in the properties as opposed to their transferees that they, and not the latter, should be held accountable for the income from the properties and be entitled to the depreciation deduction.

By contrast, in the case before us, respondent does not so blithely abandon ship and it is the efficaciousness of the lease, itself, which he now frontally attacks. Simply stated, respondent's position is that Fourth Cavendish and Medway, its transferee, are severally or collectively merely a pipeline through which Broadway transmits its mortgage payments to the insurance companies, lacking independent significance.[21]

Under the *Frank Lyon* test, petitioners must show not only that their participation in the sale-leaseback was not motivated or shaped solely by tax avoidance features that have meaning-

---

[21]Respondent does not argue that *Bolger* should be distinguished because the partnerships here may not have assumed (at least at the inception of the sale-leaseback transaction) all of the obligations of the single-purpose financing corporation. Cf. *Davis v. Commissioner*, 66 T.C. 260 (1976), affd. 585 F.2d 807 (6th Cir. 1978), cert. denied 440 U.S. 981 (1979). For example, Fourth Cavendish transferred all its interest in the property to the trustee for the insurance companies under the mortgage indenture, and Fourth Cavendish also assigned all its interest in the lease to the trustee. In addition, we have found as a fact that Medway did not assume Fourth Cavendish's obligations under the lease until Jan. 12, 1970.

less labels attached, but also that there is economic substance to the transaction independent of the apparent tax shelter potential. Another way of stating the test is suggested by the Ninth Circuit's opinion in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), to wit: Could the buyer-lessor's method of payment for the property be expected at the outset to rather quickly yield an equity which buyer-lessor could not prudently abandon? An affirmative answer would produce, in the words of the Circuit Court, "the stuff of substance. It meshes with the form of the transaction and constitutes a sale." (544 F.2d at 1098.) Consequently, if the test is not met, the buyer-lessor will not have made an investment in the property, regardless of the form of ownership. And it is fundamental that depreciation is not predicated upon ownership of property but rather upon an investment in property. *Estate of Franklin v. Commissioner, supra* at 1049; *Mayerson v. Commissioner,* 47 T.C. 340, 350 (1966).

We recognize that the result in *Estate of Franklin* was predicated upon a finding that the purchase price of the property in question exceeded a demonstrably reasonable estimate of the fair market value. Nevertheless, we consider the imprudent abandonment test to be equally applicable to other fact patterns. For example, we find it appropriate to inquire, as we do in the instant case, whether the foreseeable value of the property *to the buyer-lessor* would ever make abandonment imprudent. This then requires an examination of the economics of the buyer-lessor's position to determine whether there has been, in fact, an investment in the property.

Petitioners and respondent each relied substantially upon the testimony of expert witnesses to show the presence or absence of economic motivation on the part of petitioners. In our findings of fact, we have recited in detail the qualifications of the respective experts and the conclusions they reached. We now explore the rationale behind their respective conclusions.

We begin by noting that Lichter, petitioners' expert, placed substantially his entire emphasis upon the making of assumptions about the value of the property, alternatively, 30, 53, or 76 years from 1967, determining the result of those assumptions in terms of the economic return to the petitioners, and then testing the reasonableness of the underlying assumptions. Lichter assumed that the property (land and building) would be worth

its purchase price of $3,150,000 (rounded off from $3,144,337) on the date Broadway decided not to extend the lease, whether it be 30, 53, or 76 years from the commencement of the lease. He then calculated the discounted rate of return to be 7.08 percent, 4.81 percent, and 3.95 percent, depending upon whether Broadway terminated the lease after 30, 53, or 76 years.[22]

Lichter asserted that the 100-percent residual value theory is a reasonable and neutral assumption and one that is employed by a number of institutional lenders or purchasers in evaluating potential investments, although he did concede that the assumption might be considered "slightly positive" in this case. To illustrate the reasonableness of the assumption as applied in this case, Lichter employed several tests. Using the assessed value of $812,690 assigned to the land in 1967, Lichter concluded that the land value would have to appreciate only 4.7 percent per year for the land alone to be worth, in 1997, what the total land and improvements were worth in 1967.

Lichter then computed the value of the land, alone, in 1997, using a linear regression analysis. Linear regression analysis is simply a process of extrapolation. In this context, points on a graph represent the value of the Bakersfield land at particular times; the straight line on the graph connecting known values is extrapolated or extended so that the value at other times can be determined. Again, using *assessed* values, this time for the years 1967 through 1971, Lichter concluded that the value in 1997, as indicated by a linear regression analysis, would be $3,516,000.

Lichter employed similar calculations to determine the rate of return that would be earned by the petitioners at the end of each renewal term if Broadway chose not to extend the lease beyond each such term. Again, it was assumed that the property could be sold at such time as Broadway did not renew the lease for at least what the property was worth in 1967. Lichter also assumed that the balloon payment would be financed at $5\frac{1}{8}$-percent interest and that a portion of the rent for the first renewal period would be used to satisfy the loan payments. He calculated the discounted rate of return on the original investment resulting from a sale of the property for its original value at the end of 53 years, plus the receipt of the rental income not needed

---

[22]Lichter made computational errors in his calculations which we see no need to discuss.

to finance the balloon payments, as 4.81 percent. Similar calculations assuming a sale after 76 years resulted in a discounted rate of return of 3.95 percent.

The weakness in Lichter's approach is that it assumes a priori one of the very points in issue, namely, the residual value of the property at such time when it is no longer subject to the lease. Lichter's attempt to establish this assumed value, the 100-percent residual value, fails because neither the 100-percent residual value theory nor the two tests employed to check the reasonableness of the theory are tied to the facts. Although the accuracy of the two tests is dependent upon the accurancy of the known values, Lichter did not attempt to ascertain the known values. Rather, he simply based his projections on the assessed land values without considering any evidence of valuation techniques employed by the assessor to ascertain whether such techniques were valid or the values reasonable.

Alternatively, Lichter might have been able to lay a foundation for this evidence by undertaking his own analysis of the property and economic trends to determine independently the known values or even to check the assessor's valuation. But he did not do that. Although Lichter did examine the Bakersfield store, he did not inspect the surrounding neighborhood or the city of Bakersfield, and there is no evidence that he examined the rest of the shopping center or that he looked at the 1965 agreement between Sears and Broadway restricting use of the property. In short, he did not consider many of the factors which would normally be considered by a qualified appraiser.

This does not mean that Lichter was careless in his work; he chose the assessed values with great care to justify the result he desired. For example, in determining that the land alone would have a value in 1997 equal to its full cost if it merely increased in value by 4.7 percent per year, Lichter projected from the 1967 assessed value of $812,690. The Bakersfield store had been completed by that time, and it is common knowledge that the assessed value for developed land is higher than the assessed value for undeveloped land, simply by virtue of the development. Thus, even if that value were accurate at the time, it was an inappropriate value from which to project the future value of the land. Had Lichter chosen the purchase price for the land of $198,135.66, his figures would be much different.

In short, Lichter did not establish the necessary factual link

between the instant property and his assumptions. It might have been gratifying for petitioners to know that they could expect to realize a certain return on their investment if the property will be worth a certain amount when the lease expires, but that knowledge has little utility if it cannot reasonably be demonstrated that the property will actually have that value. Lichter's failure to lay the proper foundation for that conclusion means that his analysis is fatally defective for purposes of this case.[23]

The knowledge and experience of Steichen (respondent's expert witness) in real estate development and investment generally, and especially with regard to retail properties, were impressive. We find his analyses, opinions, and conclusions to be generally persuasive. His report and testimony, unlike that of petitioners' expert, were based upon a thorough investigation of the property and the details of·the actual transaction before us, and we find the underlying premises of his analysis to be valid.

Steichen examined the 1965 agreement between Sears and Broadway and took it into account in his analysis. He made two trips to Bakersfield to familiarize himself with the physical aspects of the store and the shopping center, the general neighborhood surrounding the shopping center, and the city of Bakersfield as a whole. He examined the structure of the store and its merchandising layout. He examined the building permits for the store. He tried, but was unable, to examine or obtain

---

[23]Even based upon petitioners' assumptions, the present value of the property determined on a conservative actuarial basis would not be indicative of economic substance. Such assumptions are:

(1) The pre-tax net income will be $23,000 per annum, commencing at the end of 30 years and ending 23 years thereafter.

(2) The property could always be sold for its original cost: $3,150,000 (rounded).

(3) The property will be free and clear at the end of 53 years.

Deriving factors from sec. 20.2031–10(f), table B, Estate Tax Regs., the computation is as follows:

| | |
|---|---:|
| (a) Determine present value of $23,000 per year for 53 years ($23,000 x 15.9070) | $365,861 |
| (b) Subtract present value of $23,000 per year for 30 years ($23,000 x 13.7648) | 316,590 |
| Present value of net pre-tax rent | 49,271 |
| (c) Add present value of property to be received free and clear at end of 53 years ($3,150,000 x 0.0456) | 143,640 |
| Present value of the property | 192,911 |
| Cost of petitioners' interest | 334,000 |
| Deficit | (141,089) |

copies of the tax assessor's records for the property. He did consider the impact of increasing interest rates.

Based upon the investigations he made in the field and personal observations he made by driving through the area surrounding the store, Steichen concluded that the property was located in the fastest growing suburban neighborhood in the city of Bakersfield, and that the shopping center was located there in order to serve the growing suburban market.

Although the shopping center appeared to be a well-constructed and well-maintained facility with a good representation of both local and national tenants, Steichen noted that the store showed signs of obsolescence both in terms of its merchandising layout and its structure. The store was not characteristic of the type of facility which was being developed by the department store industry in 1976. Steichen determined that the life expectancy of the housing stock being developed in the Bakersfield area in 1967 followed the "general rule"[24] and would have a life of at least 50 to 60 years with little change in the characteristics of the inhabitants of that housing stock.

In Steichen's opinion, it is highly unlikely that a department store would go into a location with the expectation of occupying a building at that location for only 30 years. Since Broadway found there was economic justification to enter this market area, Steichen expressed the belief that Broadway's expectation would run through the normal life expectancy of the viability of the market area the store was designed to serve. Consequently, Steichen believed that in 1967 and 1969, the petitioners had every reason to expect Broadway would exercise its right to extend the lease through the first-option period of 23 years.

Steichen expressed awareness of properties in the central cities of the United States having no fair market value, where the cost of demolition and improvement is in excess of the value of the underlying land. He stated that, by the year 2020, the property could very well be in the central city of the city of

---

[24]Steichen stated that, as a general rule, there is a life span in residential properties which extends somewhere between 50 and 60 years of age, after which they tend to become, if not physically deteriorated, at least marked by obsolescence and, therefore, are no longer attractive to the persons who originally inhabited them. Therefore, a residential structure which in the economic sense is consumer durable, is owned by a number of successive persons during the course of its life, with each of these persons or types of persons having different characteristics.

Bakersfield. Steichen could not, therefore, projecting back to 1967 or even in 1976, anticipate that Broadway would extend the lease past the first-option period. If Broadway did not extend the lease past the first-option period, as in his view appears to be the more likely probability, Steichen felt it could only be because the location ceased to be a viable commercial location and consequently would have very little market value.

In Steichen's opinion, the cost of removing the store was a significant factor to be considered. He explained that the store was a single-purpose structure built to serve the needs of a specific type of tenant, and if it would not serve the needs of Broadway, the likelihood of attracting another tenant of that type was extremely remote. In any event, due to the highly speculative nature of any predictions concerning the future of the property, and the fact that the value of the economic returns produced by an extension of the lease past 2021 would be relatively small on a discounted basis, Steichen concluded that the value of those returns should not be considered in determining the fair market value of the property in 1980 or 1998.

Steichen analyzed the potential sources of economic gain for the petitioners under the following categories:

(1) Net income or losses;

(2) Net proceeds resulting from: (a) mortgage refinancing; (b) condemnation; or (c) sale.

Following Steichen's approach, of which we approve, we first address the following question: At what point, at what time, and under what conditions could it be presumed there would be net income to distribute, and in what amounts? Under the lease and deed of trust, all rent payments due under the lease for the first 30 years are to be used to service the mortgage notes, so no cash flow will be available to petitioners during the 30-year period. The lease rental is sufficient to amortize 90 percent of the principal amount of the mortgage notes, leaving $313,750 due in 1998.

At the end of the initial term of the lease, petitioners will have the option of either making capital contributions to cover the balloon payment or refinancing the balloon. Since there would be little incentive to do the former, in light of the rent provisions in the lease for subsequent option periods and the probability (as discussed *supra*) that Broadway would continue its occupancy

for 23 years (at least beyond 1998), it must be assumed that, if possible, refinancing will be sought.

Assuming refinancing at 5⅛-percent interest (the rate in the original mortgage) over the 23-year period of the first lease extension, the annual financing cost would be approximately $23,000, to be paid out of the fixed rental of $47,062.50; thus leaving a total pre-tax cash flow for division among and distribution to all of the petitioners of approximately $23,000 per annum. It goes without saying that the opportunity to earn $23,000 annually, commencing 30 years from the inception of the transaction, would not in and of itself appear to justify the $334,000 original investment by the petitioners in the 14th P.A. and 37th P.A. partnerships.

The foregoing analysis assumes, of course, that Broadway would exercise its renewal option for the first 23-year period. Given the extremely favorable terms on which Broadway could renew, however, the only conceivable reason why it (or any corporate successor) would not renew would be that the property had lost its economic viability, in which event the property would also be worthless to the petitioners.

The record contains no direct explanation as to why the rent for the first renewal term was set at the exact figure of $47,062.50—1½ percent of the purchase price of the property. E. J. Caldecott, an attorney for and an officer of Broadway, testified that prior to 1965, Broadway's sale-leaseback transactions were entered into directly with the insurance companies, and the rent was structured on an agreed-upon construction percentage which normally was related to then-current interest rates. In Caldecott's words, the transaction was structured "to determine how much rent you would pay if the insurance companies were currently at a 5½ percent to 6 percent loan rate to others on a loan debt—we would get a constant of 30 years." It seems likely, therefore, that the first renewal term rent was related to the expected cost of refinancing the $315,000 balloon—an amount Broadway would have to pay or finance if the buyer-lessor defaulted.

In concluding the part of his report dealing with cash flow, Steichen stated that "an analysis of the cash flow from the rentals to be received when adjusted to reflect the financing costs indicates that there would be no cash available for distribution to the partners until the 31st year of the lease term

and that where tax considerations are not taken into account the return at that time is too small to justify the wait." We agree.

The other possibilities for economic gain foreseeable at the inception of the transaction were sale, condemnation, or destruction or mortgage refinancing of the property. Section 21 of the lease deals with a sale or transfer of the property, and provides, in effect, that if the lessor receives a bona fide offer for the purchase of the property and decides to accept such offer, the lessee would have the right to purchase the interest of the lessor for $50,000. The property would still remain subject to the nonrecourse debt. Of this purchase price, the limited partners of both partnerships would be entitled to receive, as a group, 49 percent or $24,500. The limited partners of 14th Property Associates would thus suffer a loss of $155,500, and the limited partners of 37th Property Associates would lose $130,500. If the offering price were greater than $50,000, Broadway, as lessee, would merely exercise its option and pocket the gain.

At the trial of this case, petitioners attempted to establish that the language of section 21 of the lease, quoted in our findings, was a mistake, and that section 21 was, in fact, amended during the week before the trial. According to petitioners, the effect of the amendment was to remove the $50,000 purchase option and instead simply to vest in Broadway the right to veto any proposed purchaser which was a competitor of Broadway or did not have Broadway's credit standing, Broadway no longer having any right of first refusal. Petitioners sought to show that this was the intention of the various parties to the original financing all along, and that the inclusion of the language of section 21 quoted in our findings was an inadvertence.

The trier of the facts rejected the petitioners' version as above outlined and we have no reason to find otherwise. The trial judge had the opportunity to evaluate the credibility of the witnesses and due regard is to be afforded his judgment. Rule 182(d), Tax Court Rules of Practice and Procedure. Accordingly, we have found that the relevant language of section 21 of the lease was intended to read as we have quoted it in our findings of fact.

Regardless of section 21, however, petitioners' opportunity for gain on any sale will be limited to any then-present value of the rental income flow and the residual, the combined total of which,

as we have shown, is minimal and in any event less than petitioners investment. The reason for this is that section 26(a) of the lease (also quoted in our findings) gives Broadway carte blanche to sublet the property or assign its leasehold interest after the original term of the lease. Since Broadway will thereby continue to have virtually total control of the property for an additional 68-plus years after the expiration of the original term, and since petitioners' interest will be strictly limited for all those years, Broadway, and not petitioners, will be in a position to realize the true economic value of the property by the simple expedient of using the property, itself, at nominal cost or subletting or assigning it to another for the then-going rate of property of this type in Bakersfield, Calif. In other words, Broadway's purchase option was essentially surplusage. This is, perhaps, one explanation for Broadway's magnanimous acquiescence, if it indeed did acquiesce, in the ante-trial "correction" of section 21.

Another possible source of economic gain would be through receipt of the proceeds of condemnation. However, since the act of condemnation lies wholly beyond the control of the owner or the lessee of property, and since the amounts of awards cannot even be speculated in advance, a prospective investor would not ordinarily look to condemnation as a likely source of economic gain.

Section 20.3 of the lease provides that should there be a total taking or a taking of such a substantial part of the property that in the judgment of Broadway's directors the property has been rendered unsuitable for use by Broadway in the operation of its business or it is not feasible to rebuild, the lease will terminate and the lessee must, under such circumstances, offer to purchase the property at a price equal to the unpaid principal of the notes outstanding together with unpaid interest thereon. If the lessor rejects the offer, award proceeds are to go to the lessor.

It is thus apparent that in this one situation—a substantial condemnation—there could be a potential for gain by the petitioners. It would appear questionable as to whether, in light of other lease provisions (relating to maintenance of the property, etc.), Broadway (the lessee) could simply keep the condemnation award and continue to pay rent on a nonoperative facility—a possibly attractive choice if the award were suffi-

ciently large, particularly if at the time of the award the mortgage had been substantially reduced or paid off.

Nevertheless, the possibility of condemnation for a substantial amount of money, sometime in the future, of a major installation such as a department store building is not, in and of itself, the sort of speculative chance to which even incorrigible gamblers—which we assume these petitioners are not—would likely be attracted. The record contains no intimation that, at the time the instant transactions were entered into or at any other time, there was any prospect of condemnation. We therefore heavily discount condemnation as a consideration in evaluating a potential source of economic gain.

A final potential source of economic gain is through mortgage refinancing. Under the mortgage notes, a total prepayment is permitted in any calendar year beginning with 1978, subject to prepayment penalties beginning with 3 percent of the then-outstanding principal and reducing gradually to 0.15 percent in 1997. Taking into consideration the premium to be paid for prepayment and the fixed rental terms which generate no net cash flow during the initial lease term, the only opportunity for economic gain would occur in the event of a substantial decrease in interest rates below the $5\frac{1}{8}$ percent provided for in the financing.

Respondent's expert, Steichen, testified at the trial that since the stated rate of interest of the mortgage notes was below the prevailing commercial lending rates at the time the financing was obtained, and since there was already in evidence continuing upward pressure on interest rates in general, the likelihood of a substantial reduction in interest payments which would lead to an economic gain through mortgage refinancing was quite remote. We find Steichen's testimony on this point convincing.

Finally, in considering whether petitioners made an investment in the property, we consider it to be significant that none of the petitioners' cash outlays went to Broadway. Petitioners' entire investment in 14th P.A. and 37th P.A. went to Cushman and others, but not to Broadway. Such payments constituted, in one sense, brokers' commissions which customarily (and absent a special agreement for shifting the burden of commissions) are paid by the seller. We do not intend to infer that the cost of brokers' commissions is not ordinarily taken into consideration by sellers of real estate in fixing the asking price for property,

and, if the asking price is obtained, thereby passed on to the buyer. In such cases, the commissions become indirectly part of the cost of the property and one would normally expect that the purchasers of property would negotiate a return on this cash outlay in the form of increased rent. By contrast, Broadway's rent only covered that part of the investment represented by the mortgage.

Indeed, the petitioners do not pretend that the amounts paid to Cushman and others are part of the cost of the property. Rather, they seek to deduct the payments as the cost of services rendered to the partnerships. Thus, by petitioners' own admission, none of their payments went to the seller, directly or indirectly, so their investment in the property, absent the principal payments on the note, assuming arguendo they may be attributed to petitioners, was zero.

Furthermore, Broadway made substantial expenditures related to the property prior to its transfer to Medway which were not reimbursed. Using its own funds, Broadway incurred direct and indirect costs in the acquisition of the land and the construction of the store totaling $3,332,834, yet the selling price of the property under the sale-leaseback was only $3,137,700, a difference of $195,334. It might have been expected that Broadway would have undertaken to recover this outlay as a part of the sales price, but such was not the case. Thus, Broadway dealt with the transaction in this respect in the same manner as it would have done as the true owner of the property; it financed as much of the cost as possible and paid the balance from its own funds.

We are, in summary, persuaded that an objective economic analysis of this transaction from the point of view of the buyer-lessor, and therefore the petitioners, should focus on the value of the cash flow derived from the rental payments and that little or no weight should be placed on the speculative possibility that the property will have a substantial residual value at such time, if ever, that Broadway abandons the lease. The low rents and almost nominal cash flow leave little room for doubt that, apart from tax benefits, the value of the interest acquired by the petitioners is substantially less than the amount they paid for it. In terms discussed above, the buyer-lessor would not at any time find it imprudent from an economic point of view to abandon the property. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th

Cir. 1976), affg. 64 T.C. 752 (1975). There is thus no justification for the petitioners' participation in this transaction apart from its tax consequences.

Having so analyzed petitioners' lack of potential for economic gain, we must nevertheless confront the question of how petitioners' position differs, if it does, from that of the buyer-lessor in the *Frank Lyon* case.[25] The facts of the *Frank Lyon* case are rather complicated but are pointedly significant. Initially, Worthen Bank & Trust Co. (Worthen) planned to construct a bank and office building. Its plans ran afoul of legal and regulatory restrictions and, as an alternative, Worthen proposed a sale and leaseback transaction. Bank regulatory authorities approved the plan as long as Worthen retained a repurchase option after the 15th year of the lease and obtained an independent third-party buyer-lessor. Frank Lyon Co. (Frank Lyon) became interested in the transaction and, after negotiating with several other equally interested entities, Worthen selected Frank Lyon to be the buyer-lessor. Meanwhile, Worthen had already arranged for the financing and the financiers approved Frank Lyon as the buyer-lessor.

Frank Lyon, the purchaser, was a substantial corporate entity which participated actively in negotiating the terms and conditions of the sale and leaseback, was personally liable for the payment of the principal and paid, in addition to the mortgage financing, $500,000 out of its own funds to Worthen.

The terms of the agreement called for Worthen to lease the land to Frank Lyon for 76 years and to sell the building and lease it back for a 25-year primary term and eight 5-year option terms. The sale and leaseback were effected simultaneously. The lease was a net lease, with Frank Lyon's only current financial obligation being the quarterly mortgage payments. Rent payments for the 25-year primary term were calculated to exactly equal the mortgage payments: $582,224 annually for the first 11 years and $613,156 annually for the succeeding 14 years. Thereafter, the amount of rent decreased to $300,000 per year during the option periods totaling 40 years. Worthen had options to repurchase the building at periodic intervals for the amount

---

[25] *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978).

of the outstanding mortgage plus Frank Lyon's original $500,000 investment, with 6-percent interest compounded thereon.

The District Court held that Frank Lyon was entitled to the depreciation and mortgage interest deductions. The court based its finding that the substance comported with the form on the facts that the rent payments were reasonable, the option prices represented the fair market value of the properties, and the unlikelihood that Worthen would exercise the repurchase option. It refused to draw any negative inference from the fact that rentals combined with the options were sufficient to amortize the loan and pay Frank Lyon a fixed 6-percent return on its equity or that the lease was a net lease.

The Court of Appeals reversed. Analogizing property rights to "a bundle of sticks," the court concluded that Frank Lyon did not have sufficient sticks to allow it to be treated as the owner.

The Supreme Court reversed the Court of Appeals, sustaining the form of the transaction, and held that Frank Lyon was indeed the owner of the property for tax purposes, holding that "so-long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes." The Court was very careful to circumscribe the scope of its imprimatur: "we emphasize that we are not condoning manipulation by a taxpayer through arbitrary labels and dealings that have no economic significance," *Frank Lyon Co. v. United States, supra* at 584.

Among the facts in the *Frank Lyon* case which distinguish it significantly from those in the case before us are the following:

(1) The rent during the initial lease term was sufficient to completely amortize the underlying mortgage principal, whereas in the case before us, the rent will amortize only 90 percent of the note principal, leaving a sizable balloon at the end.

(2) The rent in *Frank Lyon* was fair rental value for the property and after the initial lease term was substantial and free and clear to the buyer-lessor. In the case before us, the rent is not based on fair rental value. In the first renewal option period, the rent is relatively insignificant and, if applied to amortize the refinanced balloon, will provide an insignificant, if any, cash flow to petitioners.

(3) The buyer-lessor in *Frank Lyon* paid $500,000 of its own

funds to the seller-lessee; in the case before us none of petitioners' funds went to Broadway.

(4) In *Frank Lyon*, the buyer-lessor stood to realize a substantial gain in the event the seller-lessee exercised its repurchase option; in the case before us, the petitioners cannot dispose of the property at a profit.

(5) In *Frank Lyon*, the buyer-lessor was a substantial corporate entity which participated actively in negotiating the terms and conditions of the sale and leaseback, while in the instant case the entire "deal" was packaged as a financing transaction by the orchestrator, Cushman, and then marketed by him and his colleagues as a tax shelter. While, as we have indicated previously, this factor, alone, might not be fatal to petitioners' cause, considered in concert with the other negative factors outlined above, it lends no credence to any contention that there is here present any "genuine multi-party transaction with economic substance," as mandated by the Supreme Court in *Frank Lyon*. Furthermore, the extremely casual, not to say careless, way in which the various tier partnerships were fabricated, financed, and managed gives them an aura of mechanical contrivance which does not inspire confidence in the genuineness of the requisite multiparty transaction.

We recently applied the rule in *Frank Lyon* to uphold the validity of a sale-leaseback transaction in a case where the totality of facts and circumstances convinced us that the substance of the transaction was a bona fide sale-leaseback which should be given effect for tax purposes. *Belz Investment Co. v. Commissioner*, 72 T.C. 1209 (1979). In that case, the lessee and lessor were both substantial business entities and those two parties, as in *Frank Lyon*, negotiated the terms of the transaction at arm's length. Such cannot be said for the case before us. Fourth Cavendish, the putative buyer-lessor, was organized and put into place only after the financing was negotiated and finalized.

(6) The fact that the buyer-lessor in *Frank Lyon* was personally liable on the mortgage was, of course, a significant factor supporting the bona fides of the sale-leaseback transaction in that case. Nevertheless, we regard personal liability on the mortgage as atypical in modern real estate transactions and, consequently, we consider the absence of personal liability as a neutral factor in the case before us.

In summary, after considering all of the facts and circumstances in the case before us, we find that the petitioners have failed to show a genuine multiparty transaction with economic substance, compelled or encouraged by business realities and imbued with tax-independent considerations and not shaped solely by tax-avoidance features that have meaningless labels attached. *Frank Lyon Co. v. United States, supra* at 583–584. We further find that Medway, the limited partnership from which petitioners seek to derive their deductible losses, is a mere conduit through which Broadway's debt payments pass on their way to the insurance companies. It follows that petitioners have no "investment" in the property upon which depreciation can be predicated; it also follows that the debt in question has no economic significance to the petitioners and thus they have not, in this case, secured "the use or forbearance of money." *Estate of Franklin v. Commissioner*, 544 F.2d at 1049. We therefore conclude that petitioners, as members of 14th P.A. or 37th P.A., are not entitled to deduct partnership losses resulting from depreciation allowances and interest payments.[26]

### Payments to Promoters

Our determination that the buyer-lessors served as nothing more than a conduit still leaves for consideration the question of the deductibility of the payments to the promoters.

The limited partners of 14th P.A. paid $180,000 for their interests. Seventy thousand dollars of this amount was allocated to the capital account of JRYA and then withdrawn by JRYA in 1967 as compensation for services. Young and his salesmen each received a 12½-percent commission from JRYA for each sale.

---

[26]Petitioner relies on *Hill v. Commissioner*, 63 T.C. 225 (1974), to sustain its position here. In *Hill*, the Court found that by virtue of a complicated sale and leaseback transaction, the titular owners were entitled to depreciation and interest deductions. The short answer to petitioner's argument that *Hill* should control is *Hill* antedated *Frank Lyon* which provides the basis for our decision in the instant case. More to the point, the Court found that the *Hill* transaction had economic substance. The owners had a reasonable hope of realizing economic gain; they also bore some of the risks, being required to contribute some $30,000 from their own resources during the 3-year period. Unlike the instant case, the Commissioner in *Hill* did not contest the form of the sale through an economic analysis because the facts would not support the contention that due to an excessive sale price a sale should not be deemed to have occurred. *Hill* was sanctioned because it had economic substance, something the transactions in the instant case are sorely missing.

The remaining $110,000 of the capital contributions made to 14th P.A. by its limited partners was paid by 14th P.A. as its capital contribution to Medway. Medway, in turn, paid the entire $110,000 to Cushman in 1967. Of that amount, $105,350 was treated as a salary payment to Cushman. The difference in the amount of $4,650 was treated as a withdrawal from Cushman's capital account, leaving a balance in that account of $5,097.71. The withdrawal of capital was made without any prior unanimous agreement of the partners as required by the partnership agreement.

The limited partners of 37th P.A. paid a total of $155,000 for their interests in 1969. Of this amount, $60,000 was allocated to the capital account of JRYA and then withdrawn by JRYA in 1969 as compensation for services, including commissions. The remaining $95,000 of capital contributed by the limited partners in 37th P.A. was in turn paid by 37th P.A. as its capital contribution to Grenada. Grenada, in turn, paid the entire $95,000 to Cushman allegedly as compensation for past and future services.

The $70,000 paid by 14th P.A. to JRYA in 1967, the $60,000 paid by 37th P.A. to JRYA in 1969, and the $95,000 paid by Grenada to Cushman in 1969 were deducted as section 162 ordinary and necessary business expenses, salaries to partners, on the respective partnership returns. In addition, Medway deducted, in 1967, $215,000 in salary expenses—$212,850 for Cushman and $2,150 for MacGill—although only about one-half, or $105,350, was paid to Cushman and nothing was ever paid to MacGill.

The parties agree that the payments to JRYA and Cushman must meet the requirements of section 162(a) (or sec. 212) to be deductible by the partnerships. *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Their dispute is factual in nature.

Petitioners characterize the payments as prepaid management fees and contend that the payments meet section 162 or 212 tests for deductibility as entirely reasonable and fair estimates of the value of potential future services to be rendered. Respondent contends that the payments were either capital in nature or were not properly deductions of the partnerships.

It is clear that Cushman and JRYA, through its president, Young, and its salesmen, performed substantial services in

organizing the partnership and in selling partnership shares. Similarly, it is clear that Cushman performed substantial services in putting together the sale and leaseback transaction. While expenses incurred in organizing a partnership are nondeductible capital expenses (*Cagle v. Commissioner*, 539 F.2d at 415), as are expenses incurred in connection with the sale and leaseback,[27] petitioners adhere to their assertion that the entire amount of the promoters' fees are deductible. The reason for this devotion to their argument: petitioners take the position that none of the promoters' fees is attributable to these past services.

Instead, petitioners ask the Court to believe the frivolous argument that the entire amount of the fees of the promoters is attributable to future services that JRYA is expected to render to 14th P.A. and 37th P.A. and that Cushman is expected to render to Medway and Grenada. Not only were these services nominal at most, as will be seen below, but petitioners' plaint in effect asks the Court to overlook the 12½-percent commissions paid by JRYA to its employees for selling these partnership shares.

The only significant future duty of JRYA was to have annual partnership returns prepared and this was a relatively simple task. The national accounting firm which performed this service simply used the figures reflected on the annual partnership returns of Medway and Grenada and multiplied them by the appropriate percentages to reflect the interests held by 14th P.A. and 37th P.A. JRYA paid the accounting firm a nominal fee, the amount of which cannot be determined from the record (although it was not less than $100), for preparing each tax return of 14th P.A. and 37th P.A.

On brief, petitioners argued that there was another significant service to be performed by JRYA: "communication with the petitioners and being available to answer their questions * * * including aiding petitioners who may wish to dispose of their individual partnership interest." However, petitioners have not shown that any amount of the fees of the promoters was paid for this service, much less shown what that amount was.

JRYA, as the general partner, had one other significant obligation: it was obligated to keep, or to cause to be kept, full

---

[27]The latter are capital in nature because they are expenses incurred in connection with the acquisition of a capital asset. Sec. 263(a).

and true books of account of 14th P.A. and 37th P.A. in which there would be entered all transactions of the respective partnership and annually to transmit to the limited partners financial statements in addition to the annual partnership tax returns. Petitioners evidently discounted this obligation because it was not cited on brief as one of the justifications for the large payment for future services.

In any event, no books of account were, in fact, set up or maintained during the taxable years 1967 through 1969 for 14th P.A. or during the taxable year 1969 for 37th P.A., and no annual financial statements or reports other than the partnership income tax returns were sent to the limited partners of 14th P.A. and 37th P.A. The only record JRYA kept was a trust account indicating cash received and disbursed by each partnership.

Finally, in January or February of 1970, the journal and ledger records of 14th P.A. and 37th P.A. were, for the first time, set up by Touche Ross & Co., then newly retained as the partnerships' accountants. Touche Ross's fee for setting up the partnerships' books was $7,500, and it is fair to surmise from the record that this fee covered books for JRYA's approximately 50 to 60 real property syndications of the general nature of 14th P.A. and 37th P.A. which existed during the years 1967 through 1970.

Similarly, the only significant services to be rendered by Cushman were preparation of the partnership tax returns of Medway and Grenada and maintenance of the good corporate standing of Fourth Cavendish. Although an outside accounting firm prepared these returns and was paid a fee for rendering this service, there is no basis in the record for concluding that this fee was anything but nominal. In addition, Cushman's past compensation did not pay for preparation of the returns. Cushman used Medway's small residual cash flow from the years 1968 through 1970, along with approximately $920 which had been transferred to Medway from Fourth Cavendish's capital account, to cover a portion, if not all, of these expenses for the years 1967 through 1972.

Cushman also served as the liaison between Broadway and Medway. Petitioners note that Medway granted utility easements across the property which Cushman handled, and they argue that Cushman would be responsible for arranging future

note sales in the event Broadway wanted to finance improvements in excess of $500,000. Again, however, petitioners have failed to establish that any amount of the promoters' fees, much less a specific amount, was paid to compensate Cushman for these services. In addition, nothing in Medway's partnership agreement mandated that Cushman perform these services without seeking future compensation.

Medway and Grenada were also supposed to maintain formal books of account, but none existed. The accounting records of Medway consisted of annual spread sheets which were prepared by the accountants Moroney and Donelan in conjunction with preparing the annual partnership returns of Medway. Grenada had no books of account or other accounting records other than its tax returns.

Any notion one may have that the principals are credible in their assertion that the promoters' fees were intended as prepayment for services is quickly erased by two episodes which illustrate the extent to which the promoters went in an attempt to qualify the promoters' fees, at least in form, as a deductible expense.

The first deals with the year 1967 and focuses on the promoters' attempt to maximize 14th P.A.'s deduction attributable to salary payments in 1967. Of the $110,000 paid by 14th P.A. to Medway, $105,350 was paid in turn to Cushman "for services," the nature of which are undisclosed by the record. The other $4,650 was withdrawn by Cushman as a return of capital. Under the terms of Medway's partnership agreement, which provided that all profits and losses were to be allocated on the basis of each partner's profit-and-loss sharing ratio, only 49 percent of the $105,350 should have been allocated to 14th P.A.

In 1968 when the Medway partnership return was being prepared, Milton Hecht, an employee in the real estate department of Wood, Struthers, became aware that 14th P.A.'s share of the Cushman salary was only 49 percent. He felt that the payment by 14th P.A. conflicted with the understanding of the parties, and he took steps to obviate that result.[28] The accountants were able to allocate the total salary payments to 14th P.A.

---

[28]On brief, petitioners suggest that Hecht had nothing to do with this action. They evidently forgot that he testified twice, and the second time he admitted that it was his idea to devise a means to allocate all the salary to the petitioners.

by reflecting a salary figure on the Medway return of $215,000 which was approximately double the actual figure for Medway's salary. This left 14th P.A. with a 49-percent share of the loss, equal to $105,350. Cushman and MacGill, the other two partners in Medway to whom the excess salary was allegedly paid, were not adversely affected by the fictitious salary expense because they received the newly created offsetting losses. No matter how hard petitioners attempt to defend their accounting treatment of this item by citing to a presumed intent of the parties or arguing that the same result would obtain with a special allocation, the fact remains that the parties created fictitious entries on the partnership return to achieve the desired result.

The second time the promoters took positive (and questionable) steps to manipulate the numbers occurred in 1969 with the formation of 37th P.A. and Grenada. Prior to that time, Cushman owned 50 percent of Medway, MacGill owned 1 percent, and 14th P.A. owned 49 percent. Obviously, the simple way to bring in additional limited partners would have been for 37th P.A. to acquire 49 percent of Medway. Had that been done, the $95,000 paid by 37th P.A. would clearly not have been a deductible expense. The promoters chose not to effect the transaction in this manner, opting instead to form another new partnership, Grenada, transfer Cushman's 49.5-percent interest in Medway to Grenada, and have 37th P.A. acquire a 99-percent limited partnership interest in Grenada. Cushman retained a 1-percent general partner interest in Grenada. The $95,000 paid by 37th P.A. to Grenada was paid out to Cushman as "salary to partner" and deducted by Grenada as such.

Petitioners baldly assert that Grenada was formed solely to permit Cushman to keep control of Medway to protect his relationship with Broadway. This may have been important to Cushman, but the formation of Grenada did nothing to help him in that regard. Pursuant to Grenada's partnership agreement, Cushman could have been removed as a general partner by the limited partners of 37th P.A. at any time.

Even if Cushman formed Grenada for that purpose, it is patently obvious that petitioners used Grenada in such a way as to qualify the $95,000 payment from 37th P.A., at least in form, as a deductible salary expense. It is also patently clear in this instance that petitioners do not even have a colorable argument to defend the characterization of that payment as a prepaid

salary expense. Cushman would not be called upon to perform services for Grenada. Any de minimis duties that could arise would be at the Medway level. Petitioners' argument that Grenada should bear a proportionate share of the costs of compensating Cushman because Grenada was benefiting from the services is beside the point. Cushman was allegedly already compensated for those future services.

The burden of proving whether and the extent to which the promoters' fees are deductible as payments for future services is of course on the petitioners. The petitioners have failed to carry their burden of proving that all or some portion of the promoters' fees constituted deductible prepaid fees for future services.[29]

Having decided the principal issue and the payments to general partners issue in favor of respondent, it is unnecessary for us to consider the alternative issues raised by respondent.

> *Decisions will be entered for the respondent in docket Nos. 2088–74, 5117–75, 5172–75, 5571–75, 5641–75, 5654–75, 5655–75, 6851–75, 7210–75 and 8056–76.*

> *Appropriate orders will be issued with respect to docket Nos. 5622–75, 8097–75, 8052–76, 8055–76 and 8060–76.*

---

[29]In so holding, we do not reach the question as to whether such payments for future services would, in fact, be deductible.